**MICHIGAN CHEMICAL CORPORATION,
Plaintiff,**

and

**American Mutual Reinsurance Company,
Plaintiff-Intervenor,**

v.

**The TRAVELERS INDEMNITY COMPANY, et. al., Defendants,**

and

**AMERICAN HOME ASSURANCE COMPANY, Principal Defendant and Third-Party Plaintiff,**

v.

**MIDLAND INSURANCE COMPANY,
Third-Party Defendant.**

**No. G76–96 CA5.**

United States District Court,
W. D. Michigan, S. D.

Jan. 13, 1982.

Thomas J. McNamara, Warner, Norcross & Judd, Grand Rapids, Mich., for plaintiff.

David M. Tyler, Tyler & Canham, Detroit, Mich., William G. Reamon, Law Offices of William G. Reamon, P. C., Grand Rapids, Mich., for American Home Assurance Co.

Dale W. Rhoades, Rhoades, McKee & Boer, Grand Rapids, Mich., John M. Briggs, III, Parmenter, Forsythe & Rude, Muskegon, Mich., Donald M. Haskell and Michael J. Sehr, Haskell & Perrin, Chicago, Ill., for American Mut. Reinsurance Co.

John R. Caffrey, James T. Ferrini and Thomas Burke, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, Ill., Charles N. Dewey, Jr., Dilley, Dewey & Waddell, Grand Rapids, Mich., for Ins. Co. of North America.

C. Barry Montgomery, Jacobs, Williams & Montgomery, Chicago, Ill., for Midland Ins. Co.

Robert J. Eleveld, Varnum, Riddering, Wierengo, & Christenson, Grand Rapids, Mich., Thomas J. Weithers, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Aetna Casualty & Surety.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This is a declaratory judgment action to determine the extent of insurance coverage available to Michigan Chemical Corporation to pay claims brought against it by farmers and others who have sustained damage as a result of the spread of the toxin polybrominated bipheny (PBB) throughout Michigan. Literally hundreds of such claims have been brought, and over $28 million has already been paid by the insurance companies. Presently before the Court are motions for summary judgment filed by all the parties, although Michigan Chemical seeks only a partial summary judgment.

The claimants in the lawsuits brought against Michigan Chemical contend that they were exposed to PBB in 1973 and 1974 through the wrongful conduct of Michigan Chemical. American Home Assurance Company ("American Home") has presented voluminous documentation that such exposure was due to a single misshipment by Michigan Chemical in early May of 1973. This documentation relating to the PBB mix-up includes a good deal of evidence arising out of the FDA's investigation, which one official described as follows: "Never in the history of the Food and Drug Administration has there been an investigation of the magnitude or complexity of the PBB matter." (Deposition of Alan G. Hoeting, District Director of FDA).

The evidence indicates that during a period in early 1973 Michigan Chemical was producing and distributing both a magnesium-oxide-based feed supplement (MgO), and a PBB-based flame retardant, in nearly identical brown fifty-pound bags. The only difference between the bags was the lettering of the stenciled trade names—"Nutrimaster" and "Firemaster." It appears uncontroverted that on or about May 2, 1973,

Michigan Chemical accidentally shipped PBB rather than MgO to Farm Bureau Services, which then mixed it with dairy feed. The feed was sold to farmers who soon thereafter began to complain about unpalatability and decreased milk production. Michigan Chemical claims that it can, if necessary, present evidence of more than one such misshipment; the insurers dispute that claim.

The liability indemnity coverage purchased by Michigan Chemical for the period in which these events took place involves several insurance companies. Travelers Indemnity Company ("Travelers") provided the primary insurance coverage of $1 million per "occurrence" subject to an annual aggregate limit of $1 million for each of bodily injury and property damage. In the event of losses above these limits, several layers of excess insurance provided coverage. The first excess layer involved underwriters at Lloyd's, London ("Lloyds"), which covered an additional $2 million per occurrence, but subject to an annual aggregate limit of $2 million. American Home would pay the next $15 million of any loss, following all the terms and conditions of the Lloyds policy. Aetna Casualty and Surety Company ("Aetna") contracted to share on an equal basis with Insurance Company of North America ("INA") any additional liability up to $10 million per occurrence with an annual aggregate limit of $10 million. Aetna adopted the provisions of the Lloyds policy, while INA adopted those of the Travelers policy, with certain exceptions not relevant here. Thus, there was coverage in a total amount of $28 million per occurrence.

A portion of this coverage was "reinsured"—i.e., the original insurer purchased a policy from another insurance company under which the latter assumed the liability of the original insurer to Michigan Chemical. American Mutual Reinsurance Company ("Amreco"), the plaintiff-intervenor in this case, reinsured Midland Insurance Company, which had reinsured American Home for a portion of its liability.

As noted above, the insurers have each paid Michigan Chemical an amount equal to their single-occurrence limits, for a total of $28 million. In addition, Travelers and Lloyds have paid a second time, amounts equal to their annual aggregate limits (a total of $3 million excluding deductibles). They have therefore been voluntarily dismissed from this action by the plaintiff.

It is important to understand that in every instance in this case, the single-occurrence limit of liability is equal to the annual aggregate limit of liability. Thus, the question presented by the motions is not simply whether there was more than one "occurrence." The ultimate question is whether there were occurrences in more than one policy year. If so, then Michigan Chemical is entitled to an additional $25 million of insurance coverage from the remaining parties in this case for each such additional policy year.

The key policy provision is the definition of "occurrence." The Lloyds policy, applicable to American Home, Aetna, and Amreco, states:

> The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

The Travelers policy, applicable to INA, is substantially similar:

> "Occurrence" means as respects property damage (1) an accident or (2) continuous or repeated exposure to conditions which results in injury to or destruction of tangible property, including consequential loss resulting therefrom, while this agreement is in effect. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

Michigan Chemical seeks to establish occurrences in more than one policy year by

contending that the occurrence in these circumstances was the exposure of livestock to PBB. Such exposure apparently took place many times on hundreds of farms over more than one year. Amreco asks the Court to find that the relevant occurrence took place when the damage was manifested at some later time. The insurers other than Amreco seek to have the Court declare that there was only one occurrence. They claim that either the "accident" was the misshipment, of which there was only one in May, 1973, or the PBB incident was an "exposure to conditions" which is deemed to be one occurrence by the "unifying directive" contained in the second sentence of the definition. Michigan Chemical and Amreco seek only a partial summary judgment in that they wish the Court to merely construe the policy definition of occurrence, allowing them to subsequently focus their efforts on evidence relating to the relevant event—misshipment, exposure, or manifestation of damage—but leaving the determination of how many such events took place until later.[1]

A careful reading of the definitions of "occurrence" used in these policies discloses two elements. The first is an accident (or a happening or event) or a continuous or repeated exposure to conditions. The second is property damage resulting during the policy period (while the agreement is in effect) from the accident or exposure to conditions. The parties apparently do not dispute that the PBB incident was unexpected and unintentional as required in the Lloyds definition. Nor does there appear to be disagreement over the property-damage nature of the underlying claims. Thus, there does not appear to be any significant difference in the effect of these two alternative formulations.[2]

American Home and some of the other insurers contend that the "accident" which constituted the occurrence in these circumstances was the misshipment. They argue that the policy mandates a focus upon the causal event, the negligent act of the insured. In support they claim that the prevailing judicial authority is of the view that a "per accident" or "per occurrence" clause is to be construed on the basis of the cause of the accident rather than its effect, citing an annotation at 55 A.L.R.2d 1300 (1957) and a number of cases involving fires and collisions. In one somewhat factually similar case, *Maurice Pincoffs Company v. Saint Paul Fire and Marine Insurance Company*, 447 F.2d 204 (5th Cir. 1971), it was held that the number of "occurrences" involved in a distribution of contaminated bird seed depended on the number of events or incidents for which the insured was liable. Since it was the sale of the contaminated seed for which the insured was liable, and there had been eight sales, there were eight occurrences. In this case, it is claimed that there was a single negligent misshipment which was the basis of Michigan Chemical's liability, so that there was but one causal "occurrence."

Michigan Chemical and Amreco contend that the language of these policies does not look to the act of the insured in establishing an "occurrence," because by definition an occurrence is not possible until there is exposure or damage. The provision does read that way: "Occurrence . . . shall mean an accident or . . . exposure to conditions *which . . . results in . . . property damage . . . during the policy period.*" (Emphasis added.) Thus, Michigan Chemical and Amreco claim that an indemnifiable event does not arise from the insured's abstract act of

---

1. The defendants have vigorously asserted that the requested partial summary judgment is inappropriate. They argue that the construction of an insurance contract is a question of law which cannot be decided in isolation from the material facts, which they contend have not been put before the Court by the plaintiffs. They also insist that summary judgment on a portion of a single claim is not authorized by the Federal Rules. Although the Court notes

there is authority to the contrary, *e.g., Holiday Inn, Inc. v. Aetna Insurance Co.*, 1979 Fire & Casualty Cas. 179 (S.D.N.Y.1979), it does not find it necessary to decide this question in view of the present disposition of the motions.

2. Although "event" and "happening" are arguably broader terms than "accident," the latter is sufficient to encompass the incidents at issue here.

negligence, but "occurs" when farmers and others actually suffer damage (whether that be interpreted as upon exposure or manifestation of damage). As in *Steinheider & Sons, Inc. v. Iowa Kemper Insurance Company*, 281 N.W.2d 539 (Neb.1979), a case of negligent misdelivery of a chemical packaged similarly to the desired product, there could be no indemnifiable occurrence if the truck delivering the wrong chemical had turned over; the negligent act must have resulted in damage. *Id.* at 543–44.

Michigan Chemical and Amreco point to numerous other decisions requiring damage before an occurrence can be found to trigger coverage. They observe that none of the parties in the recent case of *Insurance Company of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 686, 70 L.Ed.2d 650, endorsed the "last negligent act" theory urged upon this Court by American Home. In construing "bodily injury" and "occurrence" in the context of asbestos-related diseases, the parties in *Forty-Eight Insulations* differed on exposure versus manifestation of damage. None advanced any claim that the "occurrence" was the negligent failure to warn, allegedly because it was so implausible.

As a matter of pure logic, the fact that damage is an elemental prerequisite to an "occurrence" does not necessarily mean that the time an occurrence takes place must be the time of the damage. However, such a construction is entirely plausible on the plain meaning of the words employed. In the absence of any language to the contrary, it seems quite reasonable to conclude that an event which must result in damage during the policy period to be an "occurrence," becomes an "occurrence" at the time it results in damage.

The defendant insurers strenuously assert that there is language to the contrary in the second sentence of the definition. That is the provision in the Lloyds policy which reads: "All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."[3] They insist that this "unifying directive" unequivocally decrees that the PBB mishap was a single occurrence, since the exposure of livestock to the toxin all "emanated from" Michigan Chemical's plant. In support they cite *Transport Insurance Company v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325 (N.D. Tex.1980), which applied an identical policy provision and concluded that a pattern and practice of employment discrimination "emanated from" the company's headquarters and therefore was a single occurrence.

This appealingly simple argument is not entirely persuasive. First, the directive applies only to the "continuous or repeated exposure to conditions" referred to in the first sentence of the definition. The PBB mishap can plausibly be seen as an "accident" (or happening or event), in which case the second sentence is irrelevant. Second, in situations like this where damage may occur in more than one policy period, the directive is not consistent with the interpretation of the first sentence which finds an occurrence at the time that damage results and thus leads to multiple-period occurrences. Third, if the general conditions are defined as urged by Aetna to be the packaging, warehousing, and shipping conditions which existed at Michigan Chemical Corporation's plant in St. Louis, Michigan, then it is clear that livestock were not exposed to such conditions of the plant. The conditions to which livestock were exposed were contaminated feed and equipment on the farms. The language of the directive seems to be directed more to the "emanation" of pollution or some other nuisance than to the shipment of products.

American Home argues that the directive is analogous to the "batch clause" in *Home Insurance Company v. Aetna Casualty and Surety Co.*, 1977 Fire and Cas. (CCH) 9. In that case, chickens became ill or died from

---

**3.** The Travelers policy reads: "All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The Court finds that the difference in phraseology does not alter the result reached in this Opinion.

deficiencies caused by the insured's inactive vitamin feed supplement. Although the court stated that, "Each separate feeding and ingestion can be said to have been a separate occurrence ...," it was held that there were four occurrences because the product was sold in four batches to a feed distributor. The batch clause provided:

> All such damage arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one occurrence.

The language of the unifying directive here is significantly different from such a batch clause. A provision dealing with a "lot" of goods could have had a clear effect in this type of situation, but as discussed above, the single-premises directive has no such effect.

Thus, considering the entire definition of "occurrence," it cannot be said to have a plain and unambiguous meaning in the context of the PBB incident. The underlying facts might be interpreted as an exposure to conditions which is deemed one "occurrence," or a series of accidents which become occurrences when they result in damage.

The lack of clear meaning is further demonstrated by attention to the definition of "products liability" contained in the policies. The significance of this definition does not stem from any difference in coverage, but from the principle that the policy should be interpreted in such a way that it makes sense as a whole. *See* 3 A. Corbin, *Contracts* § 549 (1960 & Supp.1971). Michigan Chemical and Amreco contend that the insurers' interpretation of "occurrence" deprives the products liability section of any reasonable meaning.

The Lloyds definition is as follows:

The term "Products Liability" means ... Liability arising out of goods or products

manufactured, sold, handled or distributed by the Assured ... if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured ... and if such occurrence occurs away from premises owned, rented or controlled by the Assured .... [4]

Thus, products liability coverage only applies to occurrences which occur away from the insured's premises, and after the goods have been transferred. In this case, the underlying suits by farmers against Michigan Chemical are grounded in products liability. Yet there could be no products liability insurance coverage under the defendants' interpretation of "occurrence" as the misshipment or the conditions at the plant, for neither occurred away from the premises.

The same questionable result would obtain in all products liability cases, since the damaging "conditions" would always emanate from a causal event, such as negligent design or manufacture, at one or a few of the insured's manufacturing plants or engineering offices. The defendants' construction of occurrence as the causal event not only ignores the requirement of damage during the policy period, but also renders the products liability section of the policy inapplicable to any products liability cases.

In contrast, the construction urged by Michigan Chemical and Amreco gives a reasonable meaning to the language used in the policies. If an occurrence occurs when damage appears during the policy period, then almost all products liability actions are covered by the products liability portion of the insurance policy which is presumably what the drafters intended. This interpretation is also supported by the following remarks in the Fire Casualty & Surety Bulletins, apparently recognized by the parties as a leading publication in the insurance industry:

---

**4.** The Travelers policy reads:

"Products Hazard" means goods or products manufactured, sold, handled, or distributed by the Named Insured or by others trading under his name, if the bodily injury or property damage takes place after possession of such goods or products has been relinquished to others by the Named Insured or by others trading under this name and if such injury or damage takes place away from premises owned, rented or controlled by the Named Insured.

Standard provisions establish that Products Liability insurance applies to *bodily injury* or *property damage* which happens *during the policy period.* This derives from the definition of 'occurrence.'

To illustrate, let us assume that a product was *manufactured* in 1974, when the insured did not carry Products Liability insurance. It was *sold* in 1975, when Products Liability insurance was carried in Company A. The purchaser sues the insured in 1976, when Products Liability insurance was carried in Company B.

Company B must defend this claim and pay the judgment if the insured is held liable. It was the insurer on the line when the bodily injury or property damage occurred. It is of no consequence whether the alleged defect was part of the manufacturing process, during 1974, or that the purchase was made in 1975. The occurrence took place in 1976.

F. C. & S. Bulletins, "Time of Coverage," 11–12 (emphasis in original).

Some additional arguments of the parties will be briefly discussed. It is said that plaintiffs are seeking indemnity on a "claims made" basis, rather than on the basis of "occurrences" as provided for in the policy. A "claims made" policy, ordinarily written for professional liability, does not require any damage during the policy period but only that a claim be made during that period. That is clearly not what plaintiffs seek here, which is to give effect to the language of the policy requiring damage during the policy period.

American Home contends that the history of the standard insurance policy provision at issue here indicates that revisions of earlier forms were designed to "strengthen the intent that a related series of events attributable to the same cause or effect are considered one occurrence, thereby avoiding the application of policy limits several times," citing Frumer and Friedman, *Law of Products Liability* § 50.05 at 19–81 (1979). Michigan Chemical claims that the pertinent insurance industry literature indicates that the "continuous and repeated exposure" language was intended to cover pollution cases, not products liability claims, citing *Fire Casualty & Surety Bulletin,* Jan. 1978, at 1. The Court finds precious little insight into the meaning of the policy language in the PBB context to be gleaned from this history. Even if the drafters primarily intended to cover pollution cases, the spread and ingestion of PBB might well be said to come within that intent. In any event, the Court must look more to the words used and the intent of the parties to the contract than to the intent of the drafters of the standard policy.

American Home argues that the intent of the parties will be defeated by a multiple-occurrence interpretation. American Home emphasizes that liability insurance policies are contracts which do not insure the injured person, but rather indemnify to the extent of policy limits one who incurs liability to the injured party. The "cause theory" decisions are therefore correct, according to American Home's brief, because they recognize that the contracting parties intend coverage will be limited to the policy terms, whereas the "effect theory" "may easily expand the stated limit in the policy into indefinite and larger amounts than the ones on which the premiums were based when a chain reaction or an accident series develops." Here, it is said, the parties could not have intended or understood "occurrence" to mean that each livestock ingestion or death would be treated as a separate occurrence, with $15 million (American Home's original exposure) available *ad infinitum.*

American Home's argument ignores one crucial undisputed fact—the insurance companies all had annual aggregate limits of liability. The intended meaning of occurrence cannot be divined while overlooking this integral element of the policies. Since the single occurrence limits are equal to the annual aggregate limits, it is clear that the parties intended a specific amount of coverage to be available for either one massive loss or several smaller losses per year. A finding of occurrences in multiple policy years cannot be said to clearly defeat the

intent of the parties to the insurance contracts.

In fact, the conduct of the insurance companies belies any conclusion that the parties agreed on a clearly intended meaning for the term "occurrence" in a situation such as this.[5] Travelers and Lloyds have paid their limits a second time, giving rise to an inference that the insured's interpretation of multiple occurrences is a reasonable one. Amreco is arguing against the remaining insurance companies and in favor of the insured that there were occurrences in more than one policy period. Even the American Home employees handling the PBB matter initially took the position that there were multiple occurrences.

The Court's examination of the policy language, both on its face and in consideration of arguments as to its intended meaning, compels a finding that the definition of "occurrence" as applied to the facts of this case is ambiguous. The policies do not clearly indicate whether an occurrence "occurs" at the time of the causal event, or at the time damage takes place during the policy period. Although the defendants can argue that their interpretation is more reasonable, the insured need only present a reasonable construction of the policy to invoke the settled rule of construction in favor of the insured. "If there are ambiguities in the policy, or uncertainty over its interpretation, the policy is to be construed against the insurer, and in favor of the insured. *Tiffany Decorating Co. v. General Accounts Fire and Life*, 12 Ill.App.3d 597, 299 N.E.2d 378 (1973)." *Insurance Company of North America v. Forty-Eight Insulations, Inc.*, 451 F.Supp. 1230, 1237–38 (E.D. Mich.1978).[6]

It should be noted at this point that the application of this rule of construction is at least one basis for distinguishing many of the cases relied on by the defendants. That is, the rule was not applicable in cases involving disputes between insurers only, where the insured was covered in any event, as in *Pincoffs*, 447 F.2d 204 (5th Cir. 1971), and in *Union Carbide Corporation v. Travelers Indemnity Company*, 399 F.Supp. 12 (W.D.Pa.1975). In other cases, the rule operated in favor of the insured's interpretation of a single occurrence where the opposite result would require the insured to pay multiple deductible amounts for each of many occurrences. *E.g., Champion International Corporation v. Continental Casualty Company*, 546 F.2d 502 (2d Cir. 1976) *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); *Lee Way*, 487 F.Supp. 1325 (N.D.Tex.1980); *E. B. Michaels v. Mutual Marine Office, Inc.*, 472 F.Supp. 26 (S.D.N.Y.1979).

This Court is of the opinion that the term "occurrence" as used in the policies at issue should be construed as taking place at the time that damage results during the policy period. Any interpretation of the meaning of "property damage" in the context of PBB exposure, however, would be prema-

5. As the District Court said in *Insurance Company of North America v. Forty-Eight Insulations, Inc.*, 451 F.Supp. 1230 (E.D.Mich.1978), *affirmed*, 633 F.2d 1212 (6th Cir. 1980), "[T]he conduct and correspondence of some of the insurers in this case are instructive on the issue of interpretation of the policies involved (citations omitted). The meaning the parties themselves attach to the terms of the contract can be inferred from their conduct." 451 F.Supp. at 1239 (noted at 633 F.2d 1217).

6. There appears to be no dispute that Illinois law applies in this case. A federal district court sitting in diversity must apply the substantive law of the state in which it sits. *Klaxon Company v. Stentor Manufacturing Company*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In a contract diversity action, Michigan conflict-of-law rules require the application of the law of the state in which the insurance policies were issued and countersigned. *Forty-Eight Insulations*, 481 F.Supp. at 1237, adopted by the Sixth Circuit in 633 F.2d 1212, 1219 (1980). INA states that its policy was issued to Northwest Industries, Michigan Chemical's parent corporation, at Northwest's Chicago location, and that it was countersigned in Chicago. The same apparently applies to the other policies. In any event the law of Illinois appears indistinguishable from the general rule of construction of ambiguities in favor of the insured. *E.g., Bush v. Metropolitan Life Insurance*, 656 F.2d 231 (6th Cir. 1981); *C. H. Heist Caribe Corporation v. American Home Assurance Company*, 640 F.2d 479 (3rd Cir. 1981).

ture at this time.[7] The Sixth Circuit, in addressing the analogous question of the meaning of "bodily injury" in the context of asbestos exposure, relied heavily in *Forty-Eight Insulations* on medical evidence of the nature of asbestos injuries and on the principle of construing the policy to promote coverage. It would be inappropriate for this Court to choose between Michigan Chemical's exposure theory and Amreco's manifestation-of-damage theory as the best interpretation of "property damage" in the context of PBB exposure without more evidence. Necessary evidence would include medical evidence of the nature of PBB damage, and perhaps evidence of relevant dates that would indicate which construction would promote coverage. Since other courts have reached results different from that of the Sixth Circuit with respect to the same asbestos problem, *see Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Company, et al.*, 523 F.Supp. 110 (D.Ma. 1981) (manifestation theory adopted); *Keene Corporation v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir. 1981) (both exposure and manifestation trigger coverage), and with respect to the similarly delayed injury caused by the chemical DES, *American Motorists Insurance Company v. E. R. Squibb & Sons, Inc.*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct.1978) (manifestation of damage fixed date of occurrence), it may well be that the result as to PBB ought to differ from the result in *Forty-Eight Insulations*.

For the reasons stated, the Court concludes that "occurrence" must be construed on these facts as taking place when property damage results and not at the time of the misshipment of PBB or from conditions at the plant. The defendant insurers' motions for summary judgment seeking a declaration of a single occurrence are therefore denied. The motions of Michigan Chemical and Amreco are to be held in abeyance insofar as they seek an interpretation of occurrence which defines the damage as either exposure to PBB or manifestation of

damage, pending the receipt of additional evidence.

IT IS SO ORDERED.

---

7. The ruling requested by Amreco on four individual claims would *a fortiori* be premature.