728 F.2d 374
 14 Envtl. L. Rep. 20,290
 MICHIGAN CHEMICAL CORPORATION, Plaintiff-Appellee,
and
American Mutual Reinsurance Company, Plaintiff-Intervenor-Appellee,
v.
AMERICAN HOME ASSURANCE COMPANY, Principal Defendant and
Third-Party Plaintiff-Appellant, (82-1438)
and
INSURANCE COMPANY OF NORTH AMERICA, Defendant-Appellant, (82-1439)
Aetna Casualty & Surety Company, Defendant-Appellant, (82-1440)
v.
MIDLAND INSURANCE COMPANY, Third-Party Defendant.
 Nos. 82-1438 to 82-1440.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 14, 1983.
Decided March 1, 1984.
 
 Robert F. Finke, Mayer, Brown & Platt, Chicago, Ill., Thomas J. McNamara, argued, Grand Rapids, Mich., for Michigan Chemical Corp. plaintiff-appellee.
 Donald M. Haskell, Michael J. Sehr, argued, William F. Ryan, Haskell & Perrin, Chicago, Ill., Michael W. Betz, Grand Rapids, Mich., for American Mut. Reinsurance Co. plaintiff-intervenor-appellee.
 Thomas Burke, James T. Ferrini, argued, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, Ill., A. Newton Dilley, Charles N. Dewey, Jr., Dilley, Dewey & Waddell, Grand Rapids, Mich., for Ins. Co. of North America defendant-appellant.
 D. Kendall Griffith, argued, Hinshaw, Clubertson, Moelmann, Hoban & Fuller, Thomas J. Weithers, Chicago, Ill., Robert J. Eleveld, Grand Rapids, Mich., Robert J. Feldhake, Lord, Bissell & Brook, Los Angeles, Cal., for Aetna Cas. and Sur. Co. defendant-appellant.
 David M. Tyler, argued, Tyler & Canham, Detroit, Mich., William G. Reamon, Grand Rapids, Mich., Gerald B. Mullin, Epton, Mullin, Segan & Druth, Chicago, Ill., Patrick Foley, Samuel H. Brenner, American Home Assur. Co., New York City, for American Home Assur. Co. principal defendant and third-party plaintiff-appellant.
 Theron K. Carter, Middleville, Mich., Patrick W. Priest, Kalamazoo, Mich., amicus curiae.
 C. Barry Montgomery, Jacobs, Williams & Montgomery, Chicago, Ill., for Midland Ins. Co. third-party-defendant.
 Before KEITH, CONTIE and WELLFORD, Circuit Judges.
 CONTIE, Circuit Judge.
 
 
 1
 The defendants, American Home Assurance Company (American Home), Aetna Casualty and Surety Company (Aetna) and Insurance Company of North America (INA) have filed an interlocutory appeal in response to a partial summary judgment granted by the district court in favor of the plaintiffs, Michigan Chemical Corporation (MCC) and American Mutual Reinsurance Company (Amreco). Since the district court's order involves a controlling question of law upon which there is substantial ground for difference of opinion, and since an immediate appeal will materially advance the ultimate termination of this litigation, this court has jurisdiction pursuant to 28 U.S.C. Sec. 1292(b). We reverse and remand for further proceedings consistent with this opinion.I.
 
 
 2
 MCC filed a declaratory judgment action in the district court in order to determine how much insurance coverage was available to pay farmers who had sustained property damage resulting from the distribution of contaminated livestock feed throughout Michigan. The record reflects that in early 1973, MCC produced and distributed both a magnesium oxide livestock feed supplement and a flame retardant which contained the toxin polybrominated biphenyl (PBB). These substances were packaged in nearly identical brown fifty-pound bags. The sole difference between the magnesium oxide and PBB bags was the stenciled trade names of the respective products, "Nutrimaster" and "Firemaster."
 
 
 3
 The district court found that MCC accidentally shipped PBB rather than magnesium oxide to Farm Bureau Services on May 2, 1973. The court did not determine whether any other accidental shipments occurred. Farm Bureau Services then mixed the PBB with regular feed and sold the resulting product to dairy farmers. In October of 1973, the farmers began complaining that some animals were rejecting the feed and that ingestion caused decreased milk production. After Farm Bureau Services and state authorities discovered that the feed was contaminated, 28,679 cattle, 4,612 swine, 1,399 sheep and over 6,000 chickens and other farm animals were destroyed. Their owners filed hundreds of claims against MCC and Farm Bureau Services.
 
 
 4
 MCC possessed five liability indemnity insurance policies during 1973-74, the time period in which the property damage took place. Travelers Indemnity Company (Travelers) provided the primary coverage of $1 million per "occurrence," subject to an annual aggregate limit of $1 million. If losses exceeded these limits, excess layers of insurance provided further coverage. Lloyd's of London (Lloyd's) contracted to pay the next $2 million per occurrence, subject to an annual aggregate limit of $2 million. American Home provided an additional $15 million of coverage per occurrence with an annual aggregate limit of $15 million. Midland Insurance Company reinsured some of American Home's potential liability. Amreco reinsured Midland. Finally, Aetna and INA agreed to share equally any further MCC liability up to $10 million per occurrence, subject to an annual aggregate limit of $10 million. The American Home and Aetna policies tracked the other terms and conditions of the Lloyd's policy; the INA policy adopted those of the Travelers' policy. MCC's total liability coverage for property damage during the relevant time period therefore was $28 million per occurrence.
 
 
 5
 MCC and Amreco have contended throughout this litigation that each claim filed against MCC constitutes an "occurrence" within the meaning of the insurance policies. They argue that there can be no occurrence until injury takes place because an indemnifiable event stems not from an insured's abstract act of negligence, but arises only when damage is suffered. The plaintiffs therefore assert that the five insurers are liable for $28 million per filed claim, subject to the $28 million aggregate annual limit of all the policies combined. Since all of the property damage took place in 1973 and 1974, the plaintiffs argue that MCC's total liability coverage is $56 million.
 
 
 6
 Conversely, American Home, Aetna and INA contend that the only "occurrence" was the May 2, 1973 accidental shipment of PBB. Although injury must be suffered before the insured becomes liable, the timing of the injury only determines the policy year to which that injury is assigned. The number of occurrences is said to be governed by the cause of the accident rather than its effects. Since the cause of the property damage in this case allegedly was a single mis-shipment of PBB, the defendants conclude that MCC's maximum coverage is $28 million.
 
 
 7
 To date, MCC and Farm Bureau Services have paid over $45 million in claims. The five insurers have acknowledged that one occurrence took place and have contributed $28 million to the settlement of these claims. In consideration for being dismissed from this suit, Travelers has paid an additional $1 million and Lloyd's has paid an additional $2 million. Travelers has received a refund of over $960,000 in deductibles. Lloyd's will not receive such a refund.
 
 
 8
 The plaintiffs raised one additional issue before the district court. Since Amreco's obligations expired on December 31, 1973, it is in Amreco's interest to have as many damages fall in the 1974 policy year as possible. Consequently, Amreco argued before the district court that particular damage claims should be assigned to the year in which injury to the affected animal became manifest as opposed to the year in which exposure to the contaminated feed took place. MCC, however, argued for the exposure theory.
 
 
 9
 The district court[1] found the definitions of "occurrence" in the insurance policies to be ambiguous and therefore construed the policies against the defendants. Hence, MCC's argument that the number of occurrences equals the number of claims was held to be reasonable.[2] The district court held in abeyance the plaintiffs' motions concerning whether the manifestation theory or the exposure theory would determine the policy year to which particular damages would be assigned.
 
 II.
 
 10
 Before considering the language of the insurance contracts at issue, two preliminary points merit emphasis. First, MCC contends that Michigan law rather than Illinois law controls this diversity case even though MCC did not dispute the applicability of Illinois law in the district court. 530 F.Supp. at 154 n. 6. Since MCC did not raise this argument below, it may not do so now.[3]
 
 
 11
 Second, although no Illinois case discusses the precise question at hand, we are bound by the general principles of Illinois contract law. The interpretation of an insurance contract is a matter of law subject to de novo appellate review. See, e.g., Rogers v. Robson, Masters, Ryan, Brumund & Belom, 74 Ill.App.3d 467, 470, 30 Ill.Dec. 320, 392 N.E.2d 1365 (1979), aff'd., 81 Ill.2d 201, 40 Ill.Dec. 816, 407 N.E.2d 47 (1980); Illinois Casualty Company v. Peters, 73 Ill.App.3d 33, 34, 29 Ill.Dec. 284, 391 N.E.2d 547 (1979); Rivota v. Kaplan, 49 Ill.App.3d 910, 914, 7 Ill.Dec. 176, 364 N.E.2d 337 (1977). A court should interpret an insurance contract as a whole in order to ascertain the intent of the parties and should take into account the subject matter of the contract, the circumstances under which it was made and the purpose sought to be achieved by the parties. See, e.g., Dora Township v. Indiana Insurance Co., 78 Ill.2d 376, 378, 36 Ill.Dec. 341, 400 N.E.2d 921 (1980); Weiss v. Bituminous Casualty Corp., 59 Ill.2d 165, 170-71, 319 N.E.2d 491 (1974); State Farm Fire & Casualty Co. v. Moore, 103 Ill.App.3d 250, 255-56, 58 Ill.Dec. 609, 430 N.E.2d 641 (1980). Where the parties have expressed their intent in plain and unambiguous contract terms, the language must be given its ordinary and common meaning without further construction. See, e.g., United States Fire Insurance Co. v. Schnackenberg, 88 Ill.2d 1, 4-5, 57 Ill.Dec. 840, 429 N.E.2d 1203 (1981); Dora Township, 78 Ill.2d at 378, 36 Ill.Dec. 341, 400 N.E.2d 921; Weiss, 59 Ill.2d at 170-71, 319 N.E.2d 491; Canadian Radium & Uranium Corp. v. Indemnity Insurance Company of North America, 411 Ill. 325, 332, 104 N.E.2d 250 (1952); Moore, 103 Ill.App.3d at 255, 58 Ill.Dec. 609, 430 N.E.2d 641; Peters, 73 Ill.App.3d at 35, 29 Ill.Dec. 284, 391 N.E.2d 547; Rivota, 49 Ill.App.3d at 915, 7 Ill.Dec. 176, 364 N.E.2d 337. A contract term is unambiguous if it has acquired a particular legal meaning either in the Illinois courts or in the courts of other jurisdictions. Schnackenberg, 88 Ill.2d at 5, 57 Ill.Dec. 840, 429 N.E.2d 1203.
 
 
 12
 If an insurance contract is ambiguous, however, it should be construed against the insurer who drafted it in order to promote coverage for losses to which the insurance policy relates. See, e.g., Schnackenberg, 88 Ill.2d at 4, 57 Ill.Dec. 840, 429 N.E.2d 1203; Dora Township, 78 Ill.2d at 379, 36 Ill.Dec. 341, 400 N.E.2d 921; Canadian Radium, 411 Ill. at 332, 104 N.E.2d 250; Bituminous Casualty Corp. v. Chicago, Rock Island and Pacific Railroad Co., 8 Ill.App.3d 172, 175, 289 N.E.2d 464 (1972). Contractual language is ambiguous if it is susceptible to more than one reasonable interpretation. See, e.g., Joseph v. Lake Michigan Mortgage Company, 106 Ill.App.3d 988, 991, 62 Ill.Dec. 637, 436 N.E.2d 663 (1982); Moore, 103 Ill.App.3d at 256, 58 Ill.Dec. 609, 430 N.E.2d 61. Nevertheless, contract terms are not ambiguous simply because the parties disagree about their meaning. Joseph, 106 Ill.App.3d at 991, 62 Ill.Dec. 637, 436 N.E.2d 663. Moreover, a court should not strain to create ambiguity where none exists. Moore, 103 Ill.App.3d at 255, 58 Ill.Dec. 609, 430 N.E.2d 641; Ripley Resin Engineering Company, Inc. v. Great American Insurance Company, 70 Ill.App.3d 619, 622, 27 Ill.Dec. 209, 388 N.E.2d 1258 (1979). With these general principles of construction in mind, we consider the particular insurance contracts which are the subject of this case.
 
 III.
 
 13
 This interlocutory appeal presents the question of what constitutes a separate "occurrence" under each of the five insurance policies. The Lloyd's policy, which controls the liability of defendants American Home and Aetna, contains the following definition:
 
 
 14
 The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence. [Emphasis supplied.]
 
 
 15
 The Travelers' policy, which governs the liability of INA, contains a similar definition:
 
 
 16
 "Occurrence" means as respects property damage 1) an accident or 2) continuous or repeated exposure to conditions which results in injury to or destruction of tangible property, including consequential loss resulting therefrom, while this agreement is in effect. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence. [Emphasis supplied.]
 
 
 17
 The parties agree that the minor differences in the wording of these provisions are immaterial. Although the terms "event" and "happening" in the Lloyd's policy may potentially be broader in scope than the term "accident," the district court found, and the parties do not dispute, that the term "accident" encompasses the incidents which transpired here. 530 F.Supp. at 150 n. 2. Accordingly, we need not discuss whether the Lloyd's policy provides wider liability coverage for property damage than does the Travelers' policy. Second, the defendants have argued that the distribution of contaminated feed throughout Michigan was a continuous or repeated exposure to a general condition and that all such exposure constitutes one occurrence under the second sentence of both definitions.[4] The district court disagreed and held that the farm animals were exposed to a product rather than to a general condition. The latter term was said to include only such things as the conditions within a manufacturing plant or the continuous emanation of pollution or other nuisance from such a plant. In light of our interpretation of the concept of an accident which results in property damage during the policy period, it is not necessary to reach the defendants' alternative argument.
 
 A.
 
 18
 The vast majority of courts (including two courts which have interpreted the precise language of the definition of occurrence in the Lloyd's policy) have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims. See Appalachian Insurance Co. v. Liberty Mutual Insurance Co., 676 F.2d 56, 61 (3d Cir.1982) (Lloyd's policy language); Maurice Pincoffs Co. v. St. Paul Fire and Marine Insurance Co., 447 F.2d 204, 206-07 (5th Cir.1971); Barrett v. Iowa National Mutual Insurance Co., 264 F.2d 224 (9th Cir.1959); St. Paul-Mercury Indemnity Co. v. Rutland, 225 F.2d 689 (5th Cir.1955); Bartholomew v. Insurance Company of North America, 502 F.Supp. 246, 251 (D.R.I.1980), aff'd sub. nom. Bartholomew v. Appalachian Insurance Co., 655 F.2d 27 (1st Cir.1981); Transport Insurance Co. v. Lee Way Motor Freight, Inc., 487 F.Supp. 1325, 1330 (N.D.Tex.1980) (Lloyd's policy language); E.B. Michaels v. Mutual Marine Office, Inc., 472 F.Supp. 26, 29 (S.D.N.Y.1979); American Casualty Co. v. Heary, 432 F.Supp. 995, 997 (E.D.Va.1977); Union Carbide Corp. v. Travelers Indemnity Co., 399 F.Supp. 12, 15-18 (W.D.Pa.1975).[5] The number and timing of injuries is relevant in addressing the distinct question of the policy period to which each injury will be assigned. See Appalachian Insurance, 676 F.2d at 61-62.
 
 
 19
 The definitions of "occurrence" in the present insurance policies reflect this approach. First, these provisions in essence refer to an "accident" which results in injury during the policy period. The language makes the accident constituting the occurrence logically distinct from the injuries which later take place. Second, the insurance policies under review afford coverage on an "occurrence" rather than on a "claim" basis. The use of the former term "indicates that the polic[ies were] not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claim[s] for damages." Champion International Corp. v. Continental Casualty Co., 546 F.2d 502, 505-06 (2d Cir.1976), cert. denied, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); see also Lee Way, 487 F.Supp. at 1329. We hold that where the courts over such an extended period of time have reached virtually a uniform result in interpreting the term "occurrence" (including two courts which have interpreted the exact language of the Lloyd's policy), and where the policy language reflects this approach, the policy terms admit of only one reasonable interpretation. The terms therefore are unambiguous and require no further construction.
 
 
 20
 We are aware of only one case which calculated the number of occurrences by referring to the number of injuries rather than to the cause or causes of those injuries. See Elston-Richards Storage Co. v. Indemnity Insurance Co. of North America, 194 F.Supp. 673, 678-82 (W.D.Mich.1960), aff'd., 291 F.2d 627 (6th Cir.1961). Although this court decided Elston-Richards, the holding is not binding because the current litigation involves Illinois law. We are persuaded that if the Illinois courts were presented with the current case, they would follow the overwhelming majority of decisions which have held that the number of occurrences is determined by examining the cause or causes of the damage.
 
 B.
 
 21
 The plaintiffs attempt to distinguish the cases upon which the defendants rely by arguing that in most of the cited cases, injuries or damages were suffered immediately after the causal event took place. This scenario contrasts with the present situation in which several months elapsed between the mis-shipment or mis-shipments of PBB and the resulting property damage. One commentator has suggested that if a single cause and numerous injuries are closely linked in time and space, then there has been one occurrence, but if a cause and its effects are temporally removed, then each injury constitutes an occurrence. See Annot., 55 A.L.R.2d 1300, 1304 (1957). This argument, however, was considered and rejected by the Third Circuit in the Appalachian Insurance case:[6]
 
 
 22
 The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence.... Indeed, the definition of the term "occurrence" in the Appalachian policy contemplates that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over a period of time. [Emphasis supplied.]
 
 
 23
 676 F.2d at 61. See also Lee Way, 487 F.Supp. at 1330. In addition, the fact patterns of the Champion, Pincoffs and Union Carbide cases demonstrate that the number of injuries or claims, even if temporally removed from their causes, are irrelevant when determining the number of occurrences.[7]
 
 
 24
 Next, we hold that many of the cases cited by the plaintiffs are distinguishable. Three of these cases involved asbestosis claims by persons who had been exposed to asbestos and had developed lung disease over a period of years. Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co., 682 F.2d 12 (1st Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983); Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034 (D.C.Cir.1981), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). The primary issue in those cases was whether to adopt the exposure theory or the manifestation theory in ascertaining the policy period to which claims would be assigned. The courts did not address the question of the number of occurrences. Indeed, the choice between the exposure and manifestation theories is the precise issue which the district court reserved in the present case.
 
 
 25
 The cases of Hamilton Die Cast, Inc. v. United States Fidelity and Guaranty Co., 508 F.2d 417 (7th Cir.1975); Kirkham, Michael & Associates, Inc. v. Travelers Indemnity Co., 493 F.2d 475 (8th Cir.1974) and Steinheider & Sons, Inc. v. Iowa Kemper Insurance Co., 204 Neb. 156, 281 N.W.2d 539 (1979) also are distinguishable. The words "occurrence" and "accident" have traditionally been used in two senses. The terms refer to the cause or causes of injury and also to the injuries themselves. See Union Carbide, 399 F.Supp. at 16. The courts in Hamilton Die Cast, Kirkham and Steinheider used the terms in the latter sense.
 
 
 26
 In Hamilton Die Cast, the plaintiff had been sued for manufacturing defective tennis racket frames. It filed a declaratory judgment action against its insurer. The court held for the insurer on three grounds, one of which was that there had not been an "occurrence," i.e., no one had been injured by one of the plaintiff's defective racket frames. The case therefore stands only for the unexceptionable proposition that before an insured party can be held liable under an insurance policy like the one involved in the present litigation, someone or something must be injured. In contrast, the parties in the current case agree that at least one occurrence took place and that many animals were injured; the issue is how many occurrences there were. As we have indicated at 379, supra, courts look to the cause or causes of damage to determine the number of occurrences for purposes of applying coverage limitations. The court in Hamilton Die Cast expressly stated that it was not considering the latter issue. 508 F.2d at 420.
 
 
 27
 In Kirkham, the parties agreed that an accident had taken place. The sole issue was the policy period to which the accident would be assigned. The court held that the accident fell within the policy period in which the plaintiff sustained damage. This holding is perfectly consistent with the general rule that the number of occurrences is calculated by examining the cause of an accident whereas the date of an occurrence is determined by referring to the time of injury.
 
 
 28
 Finally, the question in Steinheider was not the number of occurrences but rather was whether the insurance policy excluded products liability coverage. In resolving this issue, the Nebraska Supreme Court held, much like the Seventh Circuit had stated in Hamilton Die Cast, that an insured party cannot be liable until injury is sustained. The discussion in Steinheider about when an occurrence happens simply is not relevant to the question before this court.
 
 IV.
 
 29
 The plaintiffs also argue that if the number of occurrences is calculated by examining the cause or causes of injury, then the definitions of products liability contained in the policies under review make no sense. If the plaintiffs are correct, then our interpretation of the contract violates the general rule that an agreement is to be construed as a whole in order to effectuate all of its provisions. See, e.g., Joseph, 106 Ill.App.3d at 991, 62 Ill.Dec. 637, 436 N.E.2d 663. The Lloyd's policy defines the term "Products Liability" as:Liability arising out of goods or products manufactured, sold, handled or distributed by the Assured ... if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured ... and if such occurrence occurs away from premises owned, rented or controlled by the Assured....
 
 
 30
 The Travelers' policy contains the following language:
 
 
 31
 "Products Hazard" means goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, if the bodily injury or property damage takes place after possession of such goods or products has been relinquished to others by the Named Insured or others trading under this name and if such injury or damage takes place away from premises owned, rented or controlled by the Named Insured.
 
 
 32
 The plaintiffs contend that under these definitions, an "occurrence" must take place: (1) after the insured has relinquished control of the product and (2) away from the latter's premises. They argue that under the cause theory, however, occurrences such as mis-shipments or defects in construction and design normally will happen at the insured's facility. The plaintiffs therefore conclude that if this court adopts the cause theory, then the products liability coverage provided in the policies will be nullified.
 
 
 33
 We disagree. First, the defendants have admitted in their briefs and during oral argument that the present case involves products liability under the provisions of the policies in question. Second, the products liability definitions stipulate when and where an occurrence must take place for products liability coverage to exist. The cause standard, however, governs only the number of occurrences; it is irrelevant in determining when and where an occurrence happens. See, Appalachian Insurance, 676 F.2d at 61-62. Consequently, using the cause test in order to calculate the number of occurrences is perfectly consistent with looking to the time and place of injury in order to decide when and where an occurrence or occurrences takes place for purposes of either applying a products liability provision or assigning a claim to a particular policy period.[8]
 
 
 34
 Third, the definition of "Product Hazard" in the Travelers' policy does not use the word "occurrence." A comparison of the two definitions under consideration reveals that the term "occurrence" in the Lloyd's policy serves the same function as the phrase "bodily injury or property damage" in the Travelers' policy. Therefore it is obvious that the Lloyd's policy uses the term "occurrence" in the products liability definition with reference to "the event of unexpected loss or hurt apart from its cause" rather than with respect to the cause itself. Union Carbide, 399 F.Supp. at 16. To state that injury or damage must happen at a particular time and place for liability to arise is not inconsistent with determining the number of occurrences by looking to the cause of such claims. In fact, the question of whether any injury or damage has taken place must be decided in the affirmative before the issue of the number of occurrences need even be considered.
 
 V.
 
 35
 Since the relevant language of the insurance policies is plain and unambiguous, this court may not resort to parol evidence[9] or to the rule of strict construction against the insurer in order to ascertain the parties' intent. We hold that under the language of these contracts, the number of occurrences must be determined by examining the cause of the property damage, i.e., the mis-shipment or mis-shipments of PBB.
 
 
 36
 As has been indicated, the district court did not decide whether only one mis-shipment of PBB occurred. We nevertheless emphasize that each shipment would constitute a separate occurrence under these policies. In the Pincoffs case, the insured made sales of contaminated birdseed to eight dealers who in turn sold the seed to pet owners. Many birds died after eating the seed. One insurer contended that the sole "occurrence" was the contamination of the seed. The court rejected this argument and held that each of the eight sales constituted an occurrence because the sales, rather than the mere possession of contaminated seed, created the exposure to liability. Id., 447 F.2d at 206-07.
 
 
 37
 The present case is highly analogous. So long as MCC retained possession of the PBB, no liability could result. The shipment of the substance constituted the act from which liability arose. Other shipments, if any took place, created additional exposure to liability and therefore were separate occurrences. In such a situation, there would not have been one uninterrupted and continuing cause, Appalachian Insurance, 676 F.2d at 61, but several distinct acts from which liability would have resulted.[10]
 
 
 38
 The district court therefore is instructed to determine how many shipments of PBB occurred. It also must determine whether the manifestation theory or the exposure theory shall apply in this case. We express no view on either issue. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion. The appellants shall recover costs on appeal, except for those costs associated with the inclusion in the appendix of materials which we have previously held to be unnecessary.
 
 
 39
 KEITH, Circuit Judge, dissenting.
 
 
 40
 I dissent from the majority's holding that the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause of the damage. In my view, the district court was correct to construe an occurrence as taking place at the time that damage resulted.
 
 
 41
 The occurrence definition in the insurance policies is composed of one sentence containing two conjunctive elements. The first element is an "accident", "happening" or "event" or a "continuous or repeated exposure to conditions". The second element is "property damage resulting during the policy period". Thus, the sentence reads that an accident does not take place until it results in damage or injury. The majority's interpretation, which makes these two elements distinct, contravenes both insurance and tort law and is contrary to a plain reading of the sentence. It is well established that liability does not result until harm occurs. In Steinheider & Sons, Inc. v. Iowa Kemper Ins. Co., 204 Neb. 156, 281 N.W.2d 539 (1979), a case relied upon by the district court and involving an incident of negligent misdelivery, the court said "there could be no indemnifiable occurrence if a truck delivering a wrong chemical had simply turned over before it got to the customer, the negligent act must have resulted in damage." 281 N.W.2d at 543-44. Thus an indemnifiable event does not arise at the time of some abstract act of negligence, but rather at the time it results in injury or harm.
 
 
 42
 The district court's interpretation of occurrence also finds support in Elston-Richards Storage Co. v. Indemnity Ins. Co. of North America, 194 F.Supp. 673, 678-82 (W.D.Mich.1960), aff'd., 291 F.2d 627 (6th Cir.1961). This Court in Elston-Richards was presented with the identical insurance policy construction issue now before it: whether the term "occurrence" in an indemnity insurance policy is defined by reference to the negligent act of the insured, or by actual events which inflict injury that follow the initial negligent act. Our Court affirmed the trial judge's holding that each separate incident of damage constituted a separate "occurrence".
 
 
 43
 Although the majority acknowledged the holding in Elston-Richards, it found the case to be inapposite because it involved Michigan law and the current litigation involves questions governed by Illinois law. At 380. This ground for distinction is woefully inadequate since the majority relies upon a multitude of cases which are not governed by the law of Illinois.
 
 
 44
 I find particularly troubling the majority's reliance in this case upon Appalachian Ins. Co. v. Liberty Mutual Ins. Co., 676 F.2d 56 (3d Cir.1982) and Transport Ins. Co. v. Lee Way Motor Freight, Inc., 487 F.Supp. 1325 (N.D.Tex.1980) because neither case involved products liability but instead concerned issues of employment discrimination. In fact, a footnote in the Appalachian opinion indicates that the case may be inapplicable in the products liability arena. The footnote reads: "[T]his is not a case where an insured commits a tortious act and then after a lapse of time a claimant is injured by the act." The majority's attempt to discount this footnote on grounds that it concerned a discussion of when an occurrence takes place as opposed to the number of occurrences is wholly unconvincing. The footnote makes no bright line distinction between "when" and "how many" and in any event the principles underlying an analysis of when an occurrence takes place would be instructive in a determination of how many occurrences took place.
 
 
 45
 Finally, the majority's opinion fails to recognize the time honored principle that an insurance policy is interpreted in such a way that it makes sense as a whole. 3A Corbin, Contracts Sec. 549 (Supp.1971). An examination of the definition of products liability in the instant policy makes it apparent that the majority's interpretation of occurrence runs contrary to this principle. Indeed, the majority's interpretation deprives the policy's products liability section of any reasonable meaning. This section provides:
 
 
 46
 The term "Products Liability" means ... liability arising out of goods or products manufactured, sold, handled or distributed by the Assured ... if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured ... and if such occurrence occurs away from premises owned, rented or controlled by the Assured.
 
 
 47
 Thus, products liability coverage only applies to occurrences which occur away from the insured's premises and after the goods have been transferred. Yet, if occurrence means the misshipment or cause of injury, then there could not be liability in this case because neither occurred away from the plant. In contrast, the district court's interpretation gives reasonable meaning to this section. As the district court stated, "if an occurrence occurs when damage appears during the policy period, then almost all products liability actions are covered by the products liability portion of the insurance policy which is presumably what the drafters intended." 530 F.Supp. at 152.
 
 
 48
 At most, an examination of the policy language and consideration of arguments as to its intended merits lead to a conclusion that occurrence should be construed as taking place at the time injury results. At the very least, one must find the terms ambiguous. Illinois' law as do most states, recognizes that an ambiguous contract should be construed against the insurer who drafted it. Therefore, the district court's decision, interpretating the contract in favor of the insured, was not clearly erroneous and I would affirm.
 
 
 
 [1]
 The district court's opinion is reported at 530 F.Supp. 147
 
 
 [2]
 The district court opinion also included other reasons which shall be discussed infra
 
 
 [3]
 Were we to reach the issue, we would hold that the district court correctly decided to apply Illinois law. A district court exercising diversity jurisdiction must apply the conflict of laws rules in the state where the court sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since this case arose in the Western District of Michigan, Michigan conflicts rules apply. Michigan provides that the interpretation of a contract is controlled by the substantive law of the state where the contract was issued and countersigned. Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1219 (6th Cir.1980), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); Chrysler Corp. v. Insurance Co. of North America, 328 F.Supp. 445 (E.D.Mich.1971). The district court found that all of the insurance contracts involved in this case were issued and countersigned in Illinois. Accordingly, Illinois law applies
 
 
 [4]
 The parties have labelled this sentence the "unifying directive."
 
 
 [5]
 The prevailing rule was best summarized in the Appalachian Insurance case:
 The general rule is that an occurrence is determined by the cause or causes of the resulting injury.... Using this analysis, the court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages.
 676 F.2d at 61. In the present case, the cause of the property damage was the mis-shipment or mis-shipments of PBB.
 
 
 [6]
 As has been indicated, the definitions of "occurrence" found in the Lloyd's and in the Appalachian Insurance Company's policies are identical. The plaintiffs, however, assert that a footnote in Appalachian Insurance renders the case inapposite. 676 F.2d at 62 n. 14. We disagree. This footnote is connected with a discussion of when an occurrence takes place for purposes of determining the policy period into which a particular injury falls rather than with a discussion of the number of occurrences. The court's opinion was dealing at that point with the relative merits of the manifestation and exposure theories. The footnote merely indicated that the court's preference for the manifestation theory under the facts of that case would not necessarily be applied to other situations involving different kinds of injuries. Since the district court in the present case expressly reserved the question of which theory would apply, that portion of Appalachian Insurance which discussed the manifestation and exposure theories is completely irrelevant to the problem at hand
 
 
 [7]
 The district court distinguished the Champion, Lee Way and Michaels decisions on the ground that the courts in those cases limited the number of occurrences so that the insured parties would not have to pay multiple per occurrence deductibles. The district court implied that this approach was consistent with the Illinois rule that an ambiguous insurance contract is to be construed against the insurer who drafted it. In the present case, however, applying those cases to limit the number of occurrences would disadvantage the insured party
 The problem with this argument is that once courts establish a legal rule, such as how the number of occurrences is to be determined, any party is entitled to rely upon that rule in future litigation. Our jurisprudence is not so result oriented that it will permit court holdings to be relied upon only if such holdings benefit a particular party. Of course, the Illinois rule that an insurance contract will be construed against the insurer remains operative provided that an ambiguity exists. No ambiguity is present, however, where numerous courts, including two courts which have interpreted identical language, have held that the number of occurrences is to be calculated in a particular manner.
 The district court also distinguished the Pincoffs and Union Carbide cases on the ground that the courts did not rely upon the strict construction rule in those cases. Nevertheless, the courts in those cases adopted the cause theory in determining the number of occurrences. The defendants therefore are entitled to reply upon those cases.
 
 
 [8]
 The quotation from the Fire Casualty & Surety Bulletins selected by the district court, 530 F.Supp. at 153 (App. at 883-84), is relevant only to the question of when an occurrence takes place and to which policy period a particular products liability claim should be assigned
 
 
 [9]
 This court may not, for instance, take into account various memos prepared by employees or representatives of the insurance companies when preparing for this litigation
 
 
 [10]
 The facts of the Champion case are not persuasive on this point. The insured in that case sold defective vinyl to twenty-six recreational vehicle manufacturers who in turn used the vinyl in 1,400 vehicles. The court held that one occurrence, not 1,400, had taken place. 546 F.2d at 505-06. The Pincoffs court, however, would have ruled that 26 occurrences had happened. We follow the Pincoffs approach because the court in Champion did not advert to the possibility that 26 occurrences had taken place