**UNION CARBIDE CORPORATION,**
Plaintiff,

v.

**The TRAVELERS INDEMNITY COMPA-NY and the Aetna Casualty and Surety Company, Defendants.**

**Civ. A. No. 72–467.**

United States District Court,
W. D. Pennsylvania.

Aug. 4, 1975.

George Cass, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for plaintiff.

John David Rhodes, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., Lamar Tooze, Jr., Tooze, Kerr & Peterson, Portland, Or., for Travelers Indemnity Co.

Frederick N. Egler, Egler, McGregor & Reinstadler, Pittsburgh, Pa., for Aetna Cas. & Sur. Co.

## OPINION

WEBER, District Judge.

This action involves a suit for declaratory judgment by an insured, Union Carbide Corporation (hereinafter Union) to determine coverage by its insurers, The Travelers Indemnity Company (hereinafter Travelers) and The Aetna Casualty & Surety Company (hereinafter Aetna). The loss suffered by Union was the result of a products liability suit brought against it by Neville Chemical Company on a cause of action described in *Neville Chemical Company v. Union Carbide Corporation*, 422 F.2d 1205 [3rd Cir. 1970] affirming in part 294 F.Supp. 649 [W.D.Pa.1968]. The basis of the liability of Union Carbide in that action is fully set forth in the reported Opinions of the District Court and the Court of Appeals in that case. After the decision of the Court of Appeals affirming the determination of liability of Union, but denying certain elements of damages claimed, the matter was settled between Neville and Union by the payment of $1,086,000 pursuant to an agreement under which Aetna paid $500,000 and Travelers paid $586,000; each party reserving its respective rights against the other regarding payment.

Travelers now brings this motion for partial summary judgment to determine the liability of the two insurance companies between themselves with respect to this settlement.

Travelers covers Union by an excess liability policy which requires it to pay the insured for damages suffered over and above the coverage supplied by other insurance. It is Travelers' position that coverage for this loss is fully supplied by the Aetna policy which provides for $1,000,000 "aggregate limits" of products coverage during each year of the Aetna policy in which the Neville claim evolved. Travelers claims that the damages asserted and recovered by Neville in its lawsuit and settlement were the aggregate damages of a large number of claims spread over several years and is thus entirely within the annual "aggregate coverage" limits of the Aetna policy and would therefore require no contribution by Travelers under its "excess coverage" policy.

It is Aetna's position that its liability is limited to $500,000 under coverage D of its policy which provides:

4. Limits of Liability. (a) coverages B and D.

"The limit of property damage liability stated in the declarations as applicable to 'each accident' is the total limit of the Company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as a result of any one accident."

The Aetna policy further provides:

(b) Products (including completed operations) coverages C and D.

"Subject to the limit of liability, with respect to 'each accident', the limits of . . . property damage liability stated in the declarations as 'aggregate products' are respectively the total limits of the Company's liability for all damages arising out of

the Products (including completed operations) Hazard. All such damages arising out of one lot of goods or products prepared or acquired by the names insured or by another trading under his name, shall be considered as arising out of one accident."

The liability of Union in the prior litigation was based on a jury finding, supported by the trial court's opinion and the affirmance of the Court of Appeals, that Union's use of ethyl acrylate in the processing of dripolene and its failure to warn plaintiff of the possible reaction from this use was the proximate cause of damages suffered by Neville and its customers. The jury further found and the trial and Appellate courts affirmed their finding that such use of ethyl acrylate was negligent in that it created an unreasonable risk of harm to Neville and the users of Neville's products, and that such unreasonable risk of harm was also created by the failure of Union to warn Neville of the presence of the unknown and unsuspected reactive ingredient, the consequences of which were not only foreseeable but actually anticipated by Union.

It is the contention of Travelers that the events which occurred at the Seadrift, Texas, processing plant of Union where the decision to introduce ethyl acrylate into the refining process was made, were not and could not be "accidents" nor insured events under the policy of Aetna, and further that the events at Seadrift could not be construed as an "accident" covered by the policy because the policy terms only applies,

"if the accident occurs after possession of such goods or products has been relinquished to others by the named Insured . . . and if such accident occurs away from the premises owned, rented or controlled by the named Insured".

It is Travelers' position that an accident, within the coverage of Aetna is not mere negligence or action that may produce a casualty to the claimant, but it is the casualty itself, the incident that creates a cause of action, the active and injurious result of the fault.

With respect to the contention of Travelers, it is necessary to recite the history of the Neville claim. Neville had purchased a resin—former oil from Union which was a by-product of its dripolene refining process. Neville in turn produced a variety of resins for use by the plastics industry which were sold to various manufacturers of products such as floor tile, paint, floor mats, shoes, soles and heels, and the like. After these manufacturers had incorporated Neville's resins into their manufactured products, the products were distributed through regular commercial distribution channels to other manufacturers of specific products, such as shoes, and hence to the wholesale and retail trade. It was after this chain of distribution to the ultimate consumer had been carried out that the defective nature of the product was revealed. By the course of an expectable chemical reaction the presence of the ethyl acrylate in the finished product began to work its chemical effect and an intolerable stench developed in these products which caused their rejection and demands for damages by consumers, retailers, wholesalers and manufacturers of the product. These wide-spread claims were settled by Neville and its insurance carrier and were made the basis of Neville's claim against Union. On the basis of the finding of the liability of Union to Neville it was settled for the sum of $1,086,000 in the manner above-recited.

Travelers contends that the "accident" covered by the Aetna policy is what happened to the original claimant which gave him cause to bring his claim or suit against the party next to him in the line of distribution. Because there were a large number of such original claims brought against Neville, Travelers argues that each of such claims represents an "accident" under the Aetna policy and that therefore the limit of Aetna's liability is the $1,000,000 per

year aggregate coverage for product liability claims rather than the single "accident" limit of $500,000.00. Travelers further claims that because these claims arose in more than one year the aggregate coverage of Aetna should be applied to the several years during which these claims were presented and thus the entire loss of $1,086,000 is completely covered by the Aetna policy, precluding any liability on the part of Travelers under its "excess" policy.

Summary judgment is available only where there is no genuine issue as to any material fact. Under our view of the evidentiary materials presented most facts are not disputed and we cannot find any of the disputed matters to be material to our disposition of this case. We believe that the cause of the Neville loss and consequent claim of Neville against Union has been conclusively determined in the preceding litigation and is *res adjudicata* for our present purposes. It is immaterial at this time that the testimony of Dr. Caflisch states that ethyl acrylate was not the cause of the odor. This is a matter which has been conclusively determined for the purposes of this lawsuit. Furthermore, the fact that Dr. Caflisch could identify only one particular run of Neville's that could be tied to a particular complaint does not appear to us to be material on the basis of the question of law presented here.

The essential question of law which faces us here has been passed upon by many courts and has been reviewed by the commentators. It is thoroughly explored in an Annotation *"What constitutes 'each' 'a single,' 'one,' 'anyone,' 'any', or 'an accident or occurrence within liability policy limiting insurers' liability to specified amount."* 55 A.L.R.2d 1300 (1957) and its current supplements.

We do not regard the specific words used as material.

The cases do not indicate any distinction based on the exact wording in the policy by which the singleness of the event insured against is expressed. At least, no case has been found in which a distinction has been suggested between such terms as "each," "a single," "one," "anyone," "any," or "an" accident or occurrence. 55 A.L.R.2d 1301.

The Annotation in 55 A.L.R.2d notes the differing results reached by the courts on the basic question at issue here:*

"Regarding the construction of various 'per accident' clauses, the efforts of the courts at construing them have not led to the same result. There is a conflict of authority which originates in what may be called a difference in the philosophical approach to the problem of causation. The majority of the courts take the viewpoint that the 'per accident' clause is to be construed from the point of view of the cause of the accident rather than its effect. In some instances, however, the courts have adopted the viewpoint that the 'per accident' clause is to be construed as referring to the result or effect of the accident on the persons injured or damaged and not as referring to the cause of the accident." 55 A.L.R.2d 1302, 1303.

■■ Our first point of inquiry is directed to whether or not there is any ambiguity in the language used in the Aetna policy which requires the application of certain rules of construction or the consideration of extrinsic evidence to explain the terms. While it is held that where a clause in an insurance policy is ambiguous it is construed most strongly against the insurer and in favor of the insured, the rule has no application in this instance because the controversy presented to us here does not involve a controversy between the insurer and the

---

* This is an insurance contract issued in Connecticut. No controlling decision in Connecticut has been cited by either counsel or found by the Court. We assume that the Connecticut courts would follow the prevailing general body of law. Choice of law is immaterial unless there is a difference of controlling law between jurisdictions having an interest in the matter.

insured but between two different insurance companies. The general rule of construction applicable is that the language used in the policy is to be given its popular and usual significance, and the intention of the parties, as derived from the instrument itself, is controlling. *St. Paul-Mercury Indemnity Company v. Rutland*, 225 F.2d 689 [5th Cir. 1955]; *Denham v. LaSalle-Madison Hotel Co.*, 168 F.2d 576 [7th Cir. 1948].

While the policy itself defines and limits the application of "each accident" as being "all such damages arising out of one lot of goods or products prepared or acquired by the named insured . . . shall be considered as arising out of one accident", we do not rest our determination on this clause. This question presents a disputed issue of fact because the parties present conflicting evidentiary matter on this question. These require consideration of the effect of the single purchase · order covering all of Neville's requirements, the dates and components of the various shipments from Union's Seadrift plant, from Union's Institute and Charleston plants, and from Neville's Pittsburgh and Anaheim plant. The evidentiary material submitted shows a large number of individual barge and rail car shipments to and from these plants with notations of "bad" to indicate those shipments where contamination is indicated.

For summary judgment purposes we regard this issue as not being material to our decision:

> "The only issue in this case concerns the proper construction of the Aetna Underlying Policy, and this is a matter of law which may be resolved by the court on summary judgment. *Mallad Construction Corp. v. County Federal Savings and Loan Association*, 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96 [1973]." *Home Insurance Company v. Aetna Casualty and Surety Company*, 1975 Fire & Casualty Cases, 793, 794 [E.D.N.Y. No. 74, ·Civ. 164, April 24, 1975].

■ Many courts have recognized that the word "accident" has been used in more than one sense. It has probably been discussed in legal opinions as often as any other word in the English language. *Hyer v. Inter-Insurance Exchange*, 77 Cal.App. 343, 246 P. 1055 [Cal.1926]. It has been often used in more than one sense. The two large classes of its use in the adjudicated cases are either as applied to the cause of the damage or loss or to the event of unexpected loss or hurt apart from its cause. We believe that the heavier weight of judicial authority strongly tends to the interpretation that in insurance policies which contain a limitation of coverage for each "accident" the word is intended to denote the cause of the loss rather than the effect.

In an early Pennsylvania case involving the liability of a warehouse man whose responsibility is limited to liability for negligence in preserving property, the Pennsylvania Supreme Court held:

> "It is said that the judge's use of the word 'accident' led the jury to believe that a loss occasioned by an accident is something different from a loss occasioned by negligence, whereas the two are identical. The opposite of accident is said not to be negligence but design.
>
> If accident and negligence be not opposites, we cannot regard them as identical, without confounding cause and effect. Accident, and its synonyms casualty and misfortune, may proceed or result from negligence or other cause known, or unknown.
>
> What the court meant, and in effect said, that the loss complained of may have resulted from the negligence of the defendants, or from other causes beyond their control—if from the first they would be liable for it—if from the last, they would not—and the jury were left to determine from the evidence whether it was fairly ascribable to the cause for which, they were thus instructed, the defendants would be

liable." *McCarty v. New York & Erie R. R. Co.*, 30 Pa. 247, 251 [1958].

The Pennsylvania Supreme Court in modern times and in the context of insurance policies defines an accident as:

> "An accident, simply stated, is merely an unanticipated event . . ." *Brenneman v. St. Paul F. & M. Ins. Co.*, 411 Pa. 409, 413, 192 A.2d 745, 747 [1963].

We are dealing with a products liability hazard under coverage D of the Aetna policy. It is recited that the limit applicable to "each accident" is the total limit of the company's liability for all damages arising out of injury to or destruction of all property of one or more persons or organizations, including the loss of use thereof, as a result of any one accident.

■ We believe that the term "accident" in the policy must be construed in the light of the hazard insured against. This is products liability coverage afforded to a manufacturer to cover any liability arising from negligence in the manufacture or a defect in the product. Because this manufacturer was dealing in bulk raw materials it is regularly foreseeable that any defect in the product or negligence in its manufacture would affect a large number of divers persons in the chain of distribution. As was noted in *St. Paul-Mercury Ind. Co. v. Rutland,* cite supra,

> "Manifestly, it was intended that the policy have monetary limits of coverage; but consideration of the amount stated in relation to the claimants damaged rather than the event causing the damage, would make the policy potentially limitless. Moreover, it is well known that the premium rates for liability insurance are based upon the risk insured and the potential amounts of liability covered. Such a system of computing rates is simply incompatible with the idea of virtually limitless liability depending solely upon the number of claimants." 225 F.2d (p. 692)

A leading Canadian case illustrates the relationship between the business of the insured, the hazard to be insured against, and the meaning of the term "accident" in the light of the hazard intended to be insured against. In *Andrews & George Co. Ltd. v. Canadian Indemnity Co.*, 1 D.L.R. 180 [British Columbia Court of Appeals 1951, reversed on other grounds 4 D.L.R. 180, 1952], a glue manufacturer obtained insurance from the defendant insurance company for "liability imposed by law" for "damage caused by accident". The type of glue manufactured by the plaintiff was sold to a lumber company which used it in the course of manufacture of plywood. The glue was defective and the plywood was rendered unusable. The British Columbia Court of Appeals held that the term "accident" referred to an accident in the manufacture of glue. The court considered the language of the products hazard endorsement to the Canadian policy, which is very similar to the terms of the policy in question here, with the requirement that the damage to property to others be caused by an accident after the product manufactured by the insured had left the insured's possession and away from the insured's premises.

> "Endorsement No. 10 applies *inter alia,* to damage to property to others caused by an accident arising out of the existence of any condition in the product manufactured by the appellant after the appellant has relinquished possession of the glue to others away from the appellant's premises. In my view this means damage to the property of others occurring after the appellant has relinquished possession thereof, caused by an accident arising out of some defect which had occurred in the course of manufacture of the glue, i. e. 'the existence of any condition in the product manufactured' by the appellant. The policy did not entitle the appellant to damages for any fault in the glue so long as it held it in its possession; if the glue was properly manufactured

there could be no accident. Damage could only happen if there was a fault in the manufacture of the glue. Unless the accident applies to something in the manufacture of the glue and damage to property of a purchaser resulting from such accident, the appellant got no advantage from the insurance. I think therefore that the word 'accident' applies to some defect arising in the manufacture of the glue." (pp. 182 and 183) [1]

A series of cases from various jurisdictions applies the rule that where one negligent act is the sole proximate cause there is but one "accident" even though there are several resulting injuries or losses to various claimants. Under this rule, as applied to liability insurance policies, the word "accident" is predicated on an occurrence which is the cause of the injury. It is employed to denote the cause rather than the effect.

In *Hyer v. Inter-Insurance Exchange*, 77 Cal.App. 347, 246 P. 1055 [Cal.1926], an early case applying this rule, the insured negligently collided with an oncoming automobile and was deflected by the force of the collision into the path of a second automobile. The court applied the rule that where one negligent act or omission is the sole proximate cause there is but one accident even though there are several resultant injuries or losses. The court found that the use of the plural "claims" in connection with the words "one accident" clearly indicated that the parties understood that there might be several claims arising from one accident.

In *Denham v. LaSalle-Madison Hotel Company*, 168 F.2d 576 [7th Cir. 1948], an insurance policy issued to a hotel covering liability for damage or loss of property of any guest limited liability "for any one occurrence or catastrophe" to $10,000. The fire in the hotel resulted in the loss or disappearance of the property of about 250 guests. The Court of Appeals reversed the district court and held that all losses were the result of the fire and that, therefore, they were the result of "one occurrence or catastrophe", and the limitation for a single loss applied. It is noted that this was a fire confined to a single building, but later cases have applied the rule to the fire which spread to several buildings.

In *Tri-State Roofing Co. v. New Amsterdam Casualty Co.*, 139 F.Supp. 193 [E.D.Pa.1955] the insured's employees were working on a roofing job and caused a fire which spread to adjoining buildings and ultimately damaged some eleven different properties. The insured's policy provided for property damage limits for "each accident" and an overall limit for "aggregate operations". The court in rendering declaratory judgment held that the words "each accident" did not refer to the damage done to each person affected by the given cause but to the cause itself, and that, therefore, there was but "one accident" limiting the insurer's liability under the policy.

The district court's opinion in Pennsylvania relied upon the opinion issued in *St. Paul-Mercury Indemnity Co. v. Rutland*, 225 F.2d 689 [5th Cir. 1955], where the insured's truck collided with a freight train derailing and damaging sixteen cars belonging to different owners and containing the property of various shippers. The policy contained a property damage limit for "each accident". The Court of Appeals ultimately held that all the damage pertained to one accident and was controlled by the single accident limitation of the policy. The court construed the word "accident" in its usual sense, meaning a single, sudden, unintentional occurrence no matter how many persons or things are involved. The Court noted that to apply the limitation to each of the claimants damaged rather than to the event causing the damage would make the policy potentially limitless.

---

1. "However, we prefer the reasoning of the British Columbia Court that the meaning of the word 'accident' must be relevant to the kind of product being manufactured by the insured and to the kind of loss that it could sustain by reason of a defect in manufacture . . . .".

A similar multiple victim automobile crash was involved in *Truck Insurance Exchange v. Rohde,* 49 Wash.2nd 465, 303 P.2d 659, 55 A.L.R.2d 1288 [1956], where the insured's automobile negligently crossed the center line of the highway and collided in succession with three separate motorcycles travelling in echelon formation about 75 feet apart. There were three distinct collisions. The bodily injury provisions of the insurance policy limited liability to "$20,000 each person, $50,000 each occurrence," while an endorsement recited "coverages; bodily injury liability each person $20,000, each accident $50,000". The court applied the limitation of $50,000 for each occurrence or each accident by reason of the recital in the insurance policy that the terms "accident" and "occurrence" included all injuries or damages within the scope of a single proximate cause.

An unusual situation was disclosed in *Home Insurance Co. v. Aetna Casualty & Surety Co.,* F.Supp. 1975 Fire and Casualty Cases 793 [S.D.N.Y. 74 Civ. 4164, April 24, 1975], where cross motions for summary judgment were presented by the insured, the primary insurance carrier Aetna and the excess insurance carrier Home. The Aetna policy insured against liability for damage to the property of others up to $250,000 per occurrence. The policy contained a "lot" endorsement which provided:

> "All such damage arising out of one lot of goods or products prepared or acquired by the named insured or by another trading under his name shall be considered as arising out of one occurrence."

A large number of claims had been made against a customer of the insured who used the insured's product in making chicken feed for sale to farmers throughout the country. The insured's customer had been settling these claims and the party agreed that the insured was liable to the customer to the extent of those claims. The dispute between the two insurance companies was as to the number of occurrences arising out of these facts. Both parties agreed that the "lot" endorsement controlled but were in disagreement as to the number of lots. During the period of coverage the insured produced two lots of a vitamin D3 resin which were defective. These two lots were shipped to another plant of insured where the defective resin was sprayed on corn cob fractions to produce four lots of a vitamin D3 livestock food supplement. As a result the four lots were all defective. All four lots were sold to the insured's customer which used them in making the chicken feed. The sole dispute in the case was the determination of the number of occurrences under the policy for which the limits of liability pertained. Aetna claimed that there were two lots of defective resin produced at its originating plant and that this defective resin was the proximate cause of all later injury. The Home Insurance Company claimed that the occurrences were defined by the four lots of defective livestock food supplement produced at the insured's Louisville plant. Aetna's contention is based on the argument that the initial causative factors of damage were production mistakes in the original manufacture of two lots of resin. The court rejected the argument that these production mistakes were themselves "occurrences" or "accidents" under the terms of the Aetna policy. Rather the court held that the "occurrences" or "accidents" to be the events in the causal chain which immediately preceded or occurred simultaneously with the damage, because it was not until after Louisville's lots had been sprayed and sold to the customer that the damage occurred. The court accepted that it was arguable that there was one accident or occurrence for each chicken that was poisoned by the contaminated feed but relief upon the policy limitation that all damage arising out of one "lot" of goods shall be considered as arising out of one occurrence. The court, therefore, rejected the proximate cause definition of one "lot" in favor of the "lot" closer in time to the result. While this decision removes the "accident" further from the proximate cause and closer to

the ultimate result, we believe that the result was controlled by the stipulations of the parties combining the decision of the court to the determination of what constituted "lot".

However, the same district court within a month produced another opinion on the same subject matter; *Champion International Corporation v. Continental Casualty Co.*, 400 F.Supp. 978 [1975, S.D.N.Y.] decided by Senior Judge Gus J. Solomon of Oregon, sitting by assignment. This was a suit by an insured against one of its excess insurance carriers. Insured sold a large number of vinyl covered plywood panels to manufacturers of houseboats, trailers, motor homes and campers, who installed them in their products. They were defective, and insured had to pay $1,600,-000 to settle claims of manufacturers and customers. The damage suffered by each vehicle was always less than $5,000.

The insured's primary policy was a comprehensive general liability policy issued by Liberty Mutual Insurance Company, providing a limit of $100,000 for each occurrence, $200,000 aggregate, with a $5,000 deductible per occurrence. Liberty Mutual paid the $100,000 maximum for a single occurrence. It sought the balance of its loss for one occurrence from Continental Casualty Company under an excess liability policy with limits of $1,000,000 for both single and multiple occurrences, less the amount recovered from Liberty Mutual.

Continental defended on the ground that the damage to each vehicle was a single occurrence within the meaning of the policies, and because the damage to each vehicle was less than $5,000, the amount deductible for each occurrence, it owed nothing to the insured under its policy.

Applying New York law in a diversity case, Judge Solomon found that not only is an ambiguity in an insurance policy to be construed against the insurance company, but also that if a policy can reasonably be construed in favor of the position asserted by the assured, he is entitled to recover. This is particularly applicable when the policy is denominated a "comprehensive" liability policy.

Judge Solomon determined that the sole question for him to determine was whether there was one occurrence which proximately resulted in damage to many vehicles, or whether the damage to each of those vehicles was a separate occurrence. Because he found the language ambiguous, and because the plaintiff was only required to prove a reasonable interpretation, he found the one occurrence interpretation to be a reasonable one and so construed the policy against Continental, without regard to the fact that Liberty Mutual had paid the insured under the same interpretation.

We believe that the rules of construction in favor of the insured in construing ambiguities in insurance policies are not applicable here, because the insured is not involved in the dispute. Its liability is fully covered under any interpretation. The dispute is rather between two insurance carriers.

Conceding an ambiguity, what avenue of approach is available to the court or summary judgment. We are aware of no evidence to be offered in aid of interpretation except self-serving testimony of the participants. We have found no case where the courts resorted to extrinsic testimony to resolve the ambiguity. Rather they resort to either the causal relation test, the time and space test, or the popular meaning test (with resort to dictionaries and law dictionaries).

We can only rely on the ordinary meaning of the words, in relation to the business risk to be insured against, protection from liability from a defective product produced in a continuous flow of production and intended for widespread use by many manufacturers ending in a multitude of consumer products in many hands. To hold that each ultimate consumer's dissatisfaction with the product is a separate "accident" would violate all reasonable interpretations of the term "accident". In the

same sense as Travelers argues no "accident" happened to any consumer, in the sense of a sudden, unexpected event doing damage to him or his property. The consumer ultimately discovered, sooner or later, that he had purchased a defective product, and claimed a refund of his purchase price.

■ We, therefore, find that a single "accident" occurred under the language of the Aetna policy, at the time when Union made its decision to allow the ethyl acrylate to remain in the dripolene stream at Seadrift, on about May 31, 1963. This decision, plus a failure to warn, is the established proximate cause of all the subsequent damages suffered, by a great variety of firms and individuals at various stages in the subsequent stream of distribution.

This determination is made in consideration of the great weight of judicial construction of the same or similar language in insurance contracts. While opposing views have been noted, they are in a distinct minority. There being no binding decision of the Pennsylvania appellate courts on this subject which controls in a diversity case, we apply our view of the prevailing law, as stated in 55 A.L.R.2d 1300, at p. 1303, and as reinforced by cases cited in its Later Case Service:

> "The trend of authority definitely is toward the adoption of the viewpoint that the limitation provision provides for a maximum of liability for all injuries and damages proximately resulting from one uninterrupted and continuing cause. The courts seem particularly impressed by the fact that an opposite rule may easily expand the stated limit in the policy into indefinite and larger amounts than the ones on which the premiums were based when a chain reaction or an accident series develops."

See, in addition to cases cited above: *Barrett v. Iowa Nat. Mut. Ins. Co.*, 264 F.2d 224 (aff'g Montana D.Ct.) (9th Cir. 1959); *Travelers Indem. Co. v. New England Box Co.*, 102 N.H. 380, 157 A.2d 765 (N.H.1960); *Wilkinson & Son, Inc. v. Providence Washington Ins. Co.*, 124 N.J.Super. 466, 307 A.2d 639 (1973); *Bacon v. Miller*, 113 N.J.Super. 271, 273 A.2d 602 (1971); *Weissblum v. Glen Falls Ins. Co.*, 31 Misc.2d 132, 219 N.Y.S.2d 711 (1961); *Allied Grand Doll Mfg. Co. v. Globe Indemnity Co.*, 15 App.Div.2d 901, 225 N.Y.S.2d 595 (1962); *Sossamon v. Nationwide Mut. Ins. Co.*, 243 S.C. 552, 135 S.E.2d 87 (1964); *Kuhn's of Brownsville v. Bituminous Casualty Co.*, 197 Tenn. 60, 270 S.W.2d 358 (1950); *Pacific Indem. Co. v. Thompson*, 56 Wash.2d 715, 355 P.2d 12 (1960); *Olsen v. Moore*, 56 Wis.2d 340, 202 N.W.2d 236 (1972).

■ One of the Defendants has moved for partial summary judgment on this issue, and the responding defendant directs its response and supporting brief principally to the merits of the issue, rather than the availability of summary judgment. It would appear that the responding party's response is in this respect a cross-motion for partial summary judgment on the merits. The weight of authority dispenses with the necessity of a cross motion in such cases. 6 Moore's *Federal Practice* § 56.12. See *Highway Truck Drivers and Helpers Local 107 v. Roadway Express, Inc.*, 266 F.Supp. 868 (E.D.Pa.1966) and cases therein cited.

This is a motion for partial summary judgment by one party defendant against a co-defendant. The plaintiff who sought declaratory judgment has no part in the motion and is not affected by its outcome. Section (d) of F.R.C.P. 56 particularly commands the Court on such a motion to make its determination on the facts that appear without substantial controversy. As stated by Moore, Rule 56(d) "puts a compulsory duty upon the trial court to make a pre-trial order that formulates the issues." Vol. 6 ¶ 56.20[3.–3] at p. 2756. This we have attempted to do herein. An order to direct the further proceedings in this case will be entered in accordance with the foregoing opinion.