4 A.3d 946

BOARD OF COUNTY COMMISSIONERS
OF ST. MARY'S COUNTY

v.

MARCAS, L.L.C.

Misc. No. 3, Sept. Term, 2009.

Court of Appeals of Maryland.

Sept. 20, 2010.

Warren N. Weaver and Emily A. Daneker (Thurman W. Zollicoffer, Jr., Dale B. Garbutt, Jeremiah J. Kelly of White-ford, Taylor & Preston, L.L.P. of Baltimore, MD), on brief, for appellant.

Thomas M. DiBiagio (Timothy M. Sullivan and Erica M. Zilioli of Beveridge & Diamond, P.C. of Baltimore, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

On January 22, 2007, the United States District Court for the District of Maryland opened Case No. 8:07–cv–00196–CBD as a result of a Complaint filed by Marcas, L.L.C. against the Board of County Commissioners of St. Mary's County. On October 2, 2009, that case was "Stayed pending the receipt of the written opinion of the Court of Appeals of Maryland stating the law governing [two] questions certified" pursuant to the Maryland Uniform Certification of Questions of Law Act,[1] and Maryland Rule 8–305(b).[2] The certified questions are:

1. Whether multiple tort counts and injuries as alleged in [the] Complaint [filed by Marcas, L.L.C. against the Board of County Commissioners of St. Mary's County] constitute an "individual claim" under the Maryland Local Government Tort Claims Act [ (LGTCA) ], Md.Code Ann. Cts. & Jud. Proc. § 5–303(a); and

2. Whether the multiple tort counts and injuries as alleged in [Marcas, L.L.C.'s] Complaint constitute the "same occurrence" under the Maryland Local Government Tort Claims Act, Md.Code Ann. Cts. & Jud. Proc. § 5–303(a)[?]

For the reasons that follow, we answer "yes" to both questions. Despite the fact that Appellant's negligence is alleged to have occurred in many ways over an extended period of time, for purposes of C.J. § 5–303(a),[3] all of the causes of action in which Appellee has asserted a claim for money damages constitute an "individual claim" that arises out of the "same occurrence."

---

1. Maryland Code, §§ 12–601 through 12–613 of the Courts and Judicial Proceedings Article (2006 Repl.Vol.)

2. The certification order provided that the Board of County Commissioners shall be treated as the Appellant in the certification procedure.

3. C.J. § 5–303(a) does not apply to penalties imposed upon a local government and does not limit the amount of money that a local government must spend to comply with an order to take appropriate remedial measures.

## Background

In a Memorandum Opinion accompanying its certification order, the federal court stated:

This case arises out of [Appellee's] claims that sub-surface methane gas and other volatile organic compounds migrated from the St. Andrews Landfill to [Appellee's] adjacent property. [Appellee] alleges that each day of contamination equals a separate occurrence and separate claims for damages, thus allowing for a maximum of $500,000 in damages for each day that a violation exists. In contrast, [Appellant] argues that sub-surface migration over time amounts to one occurrence and one individual claim under the statute, resulting in a maximum total liability of $200,000.

Appellee's SECOND AMENDED COMPLAINT, in pertinent part, alleges:

### INTRODUCTION

1. This suit is brought under the federal Comprehensive Environmental Response, Compensation and Liability Act, Solid Waste Disposal Act, and in tort for releases of hazardous substances and other pollutants by [Appellant] onto the property of [Appellee]. [Appellant's] actions have damaged or threatened the environment and public health and safety and have harmed [Appellee] through damage to and loss of value of [Appellee's] property, as well as interference with [Appellee's] efforts to use, develop, and sell [Appellee's] property. [Appellee] seeks its necessary costs of response to [Appellant's] releases of hazardous substances under the federal Superfund statute as alleged in Count One; injunctive relief and damages in nuisance and trespass by [Appellant] as alleged in Counts Two and Three; damages for [Appellant's] wrongful interference with [Appellee's] business relationships as set forth in Count Four; and damages in strict liability for [Appellant's] harm to [Appellee's] property and business interests, as alleged in Count Five.

\*   \*   \*

8. The property that is the subject of [Appellee's] claims is a tract of land consisting of approximately 227 acres, located in California, Maryland, at St. Mary's County Tax Map 34, Parcel 455 (the "Property").

9. Cazimir Szlendak, a person who directly or indirectly has an interest in [Appellee], acquired the Property in 1978.

10. [Appellee] acquired the Property on April 10, 1998 from Cazimir Szlendak.

\* \* \*

22. [Appellant] began purchasing land for the St. Andrews Landfill in 1971 and completed land acquisition in 1984, for a total site area of approximately 270 acres. The Landfill includes four sanitary waste disposal cells (Cells 1–4) and one rubble disposal cell (Cell 5).

23. Active land-filling operations were conducted and wastes were disposed at the Landfill beginning in approximately 1974 under the authority of [Appellant].

24. [Appellant] was in 1974 and continues to be the owner and operator of the Landfill.

25. Disposal operations at the Landfill were conducted until [Appellant] discontinued waste disposal in Cells 1, 2, and 4 in November 1997 and in Cell 3 in February 1999. The disposal of rubble was discontinued in June 2001.

\* \* \*

COUNT ONE
COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED ("CERCLA"), 42 U.S.C. §§ 9601, ET SEQ.

\* \* \*

96. There has been a release or threatened release of hazardous substance from the Landfill.

97. [Appellee] has incurred necessary response costs, including monitoring, assessment, and evaluation costs consistent with the National Contingency Plan, in response to the releases or threatened releases from the Landfill. [Appellee] expects to incur further response costs, consistent

with the National Contingency Plan, in response to the releases from the Landfill.

98. [Appellant] is a current owner or operator of the Landfill.

99. [Appellant] was an owner or operator of the Landfill at the time of disposal of a hazardous substance.

100. Pursuant to 42 U.S.C. § 9607(a), [Appellant] is liable to [Appellee] for all necessary response costs incurred and to be incurred by [Appellee] at its Property.

## COUNT TWO
## TRESPASS

103. [Appellant] has allowed and is continuing to allow hazardous substances, pollutants and contaminants from the Landfill to invade [Appellee]'s Property and interfere with [Appellee]'s interest in the exclusive possession, use and enjoyment of the Property.

104. [Appellant] had notice of its actions giving rise to the trespass and failed to cease the actions.

105. As an actual and proximate result of the trespass by [Appellant], has been damaged in an amount greater than $10,300,000, the exact amount to be proven at trial.

## COUNT THREE
## PRIVATE NUISANCE

107. [Appellant]'s ownership and/or operation of the Landfill has been conducted and is continuing to be conducted in a manner that interferes with [Appellee's] reasonable use and enjoyment of the Property.

108. [Appellant] knew or should have known of the condition and the nuisance or unreasonable risk involved.

109. [Appellant] knew or should have known that the condition existed without the consent of [Appellee].

110. [Appellant] has failed, after a reasonable opportunity, to abate the condition.

111. As an actual and proximate result of the nuisance maintained by [Appellant], has been damaged in an amount

greater than $10,300,000, the exact amount to be proven at trial.

## COUNT FOUR

## INTERFERENCE WITH BUSINESS OR ECONOMIC RELATIONSHIP

115. [Appellant] wrongfully interfered with [Appellee's] business or economic relationship though intentional and willful acts that had the foreseeable effect of causing damage to [Appellee] in its lawful business of developing property within the First Colony PUD.

116. [Appellant] caused damage to [Appellee] in its lawful business without right or justifiable cause.

117. As an actual and proximate result of [Appellant]'s actions, [Appellee] was damaged in an amount greater than $2,000,000, the exact amount to be proven at trial.

## COUNT FIVE

## STRICT LIABILITY FOR ABNORMALLY DANGEROUS OR ULTRAHAZARDOUS ACTIVITY

119. [Appellant's] operations of the Landfill as an open dump in violation of the Solid Waste Disposal Act and regulation promulgated thereunder is an activity that is unduly dangerous and inappropriate to the place in which it is conducted.

120. As an actual and proximate result of [Appellant's] activity, [Appellee] has been damaged in an amount greater than $10,300,000, the exact amount to be proven at trial.

## COUNT SIX

## SOLID WASTE DISPOSAL ACT ("SWDA"), 42 U.S.C. § 6972(a)(1)(A)

123. [Appellant] has allowed and is allowing known carcinogens and other pollutants to discharge from the Landfill into waters of the United States without a permit in violation of the requirements of § 402 of the Clean Water Act, 33 U.S.C. § 1342.

124. [Appellant] has allowed and is allowing methane gas to exceed its lower explosive limit at the facility boundary of the Landfill.

125. [Appellant] has allowed and is allowing uncontrolled public access so as to expose the public to health and safety hazards at the Landfill.

126. Because the Landfill fails to satisfy the criteria in 40 C.F.R. Part 258, including but not limited to, criteria in 40 C.F.R. §§ 258.27, 258.23, or 258.25, the Landfill is an open dump prohibited by Section 4005 of the SWDA, 42 U.S.C. § 6945.

127. [Appellant]'s operation and closure of the Landfill is in violation of the SWDA and regulations, conditions, requirements, and prohibitions that are effective pursuant to the SWDA.

128. Pursuant to 42 U.S.C. § 6972(a), [Appellant] should be enjoined from further violations of the SWDA.

COUNT SEVEN

SOLID WASTE DISPOSAL ACT ("SWDA"), 42 U.S.C. § 6972(a)(1)(B)

130. [Appellant] has contributed or is contributing to the past or present storage, treatment, transportation, or disposal of solid and hazardous wastes which present an imminent and substantial endangerment to health or the environment.

131. [Appellant] did not and does not now comply with the requirements for the management of hazardous waste at the Landfill under Subchapter III of the SWDA.

132. [Appellant] did not and does not now possess a permit for the disposal or management of hazardous waste at the Landfill.

133. [Appellant's] Landfill has not been designed, operated, or closed in accordance with the requirements of Subchapter III of the SWDA or its implementing regulations.

134. Pursuant to 42 U.S.C. § 6972(a), [Appellant] should be enjoined from further violations of the SWDA.

While pretrial proceedings were underway, the federal court granted the parties' request that the "individual claim" and "same occurrence" questions be certified to this Court.

## Discussion

In *Housing Authority of Baltimore City v. Bennett,* 359 Md. 356, 754 A.2d 367 (2000), while holding that the LGTCA's damages cap provision does not limit the liability of a local government in a tort action in which the local government itself is a defendant, this Court stated:

> In 1987 the General Assembly enacted Ch. 594 of the Acts of 1987 which affected the tort liability of local governments in several ways . . . . § 1 of Ch. 594 enacted the LGTCA.
>
> *       *       *
>
> The third section contains the monetary caps ($200,000 per individual claim and $500,000 per total claims arising from the same occurrence, § 5–303(a)(1))[.]

*Id.* at 361–62, 754 A.2d at 370. As a result of our holding in *Bennett,* in 2001, the General Assembly enacted Ch. 286 of the Acts of 2001, an emergency measure "clarifying that the monetary limits on the liability of a local government under the [LGTCA] apply to claims against local governments when named as defendants[.]" Since April 20, 2001, C.J. § 5–303(a) has, in pertinent part, provided:

> (a) *Limitation on liability,*—(1) Subject to paragraph (2) of this subsection, the liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, or liability arising under subsection (b) of this section and indemnification under subsection (c) of this section.

The terms, "individual claim," and "same occurrence," are not defined in the LGTCA. Appellant argues that, under C.J. § 5–303(a), Appellee's Second Amended Complaint asserts only one "individual claim," and the alleged contamination of Appellee's property constitutes the "same occurrence." Appellee argues that it is entitled to assert an "individual claim"

for each day that its property is contaminated, and that claims based upon different levels of pollution on different days are not claims that arise from the "same occurrence." These arguments present us with an issue of statutory interpretation.

In *Lockshin v. Semsker*, 412 Md. 257, 987 A.2d 18 (2010), this Court stated:

The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.

To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the

words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Id.* at 274–76, 987 A.2d at 28–29 (internal citations omitted).

It is clear that the limitation on liability provision was enacted "for the purpose of limiting the civil liability of local government." S. Judicial Proceedings Comm., Summary of Com. Rep., S.B. 237, pg. 3 (Md.1987). The current "cap" amounts resulted from a compromise reached by a Conference Committee convened when "neither house concurred in the other's proposed amendments to H.B. 253 or S.B. 237[.]" *Bennett, supra,* 359 Md. at 378, 754 A.2d at 379. The legislative history includes the following explanation for the cap:

The $100,000 per occurrence cap has both historic and statutory precedent. Since 1971, Boards of Education that are self-insured have been able to raise immunity for judgments in excess of $100,000. Presently, liability may be limited to $100,000 per occurrence. Further, the State's liability in action for which the State is self-insured is limited to $50,000 per individual and $100,000 per occurrence. These limits are established by regulations issued by the State Treasurer pursuant to amendments to the State Tort Claims Act effective in 1985. Thus, the cap is consistent with existing law. Considering that local governments will be paying judgments in situations where they could have previously avoided liability, the cap is equitable. The cap is necessary so that local governments can predict exposure for both insurance and budgetary purposes. Since

local governments provide vital services, unlimited recovery prudents [sic] the prospect of severely impeding the provision of such services.

Office of the Governor, Governor's Legislative Office, Briefing Paper H.B. 253/S.B. 237, 9–10.

The legislative history also includes the following testimony presented to the Senate Judicial Proceedings Committee by Maureen Lamb, then Vice President of the Maryland Association of Counties, and Chair of that organization's Legislative Committee, as well as a member of the Anne Arundel County Council:

> In the Spring of 1985 the Legislative Committee of the Maryland Association of Counties became aware of the problems that local governments were having in purchasing insurance. . . . In analyzing the situation it was soon realized that the problem was greater than merely a down cycle of the insurance market. Insurance companies were not only raising prices, they were abandoning the business of insuring governments.

S. Judicial Proceedings Committee, Testimony of Maureen Lamb (Feb. 25, 1987).

In *Bennett, supra,* this Court summarized "the status of local governmental immunity from suit up to and including the enactment of the LGTCA[.]" 359 Md. at 358–361, 754 A.2d at 368–69. In light of the fact that the LGTCA was enacted at a time when local governments were having problems purchasing insurance, we conclude that the General Assembly intended that courts would use the insurance industry's definitions of "individual claim" and "same occurrence" when applying C.J. § 5–303(a). This conclusion is consistent with *Folz v. New Mexico,* 110 N.M. 457, 797 P.2d 246 (1990) in which, while holding that all injuries resulting from "the discrete event of one runaway truck" (that collided with several different vehicles) constituted a "single occurrence" under New Mexico's Tort Claims Act, the New Mexico Supreme Court stated:

> [T]he legislature certainly might have used the term "single occurrence" in a different sense than the one used in

the insurance industry. In addition, principles of statutory construction and contract circumstances may lead to differing interpretations of similar terms. The Tort Claims Act is in derogation of plaintiffs' common-law right to sue the defendants and, therefore, is strictly construed *Methola v. County of Eddy,* 95 N.M. 329, 622 P.2d 234 (1980); *see also Holiday Management Co. v. City of Santa Fe,* 94 N.M. 368, 610 P.2d 1197 (1980) (declining to construe waiver provisions of Tort Claims Act in a manner inconsistent with remedial purpose of common-law abrogation of sovereign immunity). While the limitation of liability may form one of the objectives of both insurance companies and the New Mexico legislature, the Tort Claims Act also embodies a governmental desire to balance with this objective the needs of citizens for compensation and the need to impose duties of reasonable care on public employees. See NMSA 1978, § 41–4–2 (Repl.Pamp.1989). Nevertheless, when the legislature does not provide an express definition of an essential statutory term, it must be assumed that the legislature was aware of the construction given that term in the judicial decisions of other jurisdictions. *Cf. Buzbee v. Donnelly,* 96 N.M. 692, 699–700, 634 P.2d 1244, 1251–52 (1981) (interpreting undefined statutory term "directly negat[ing] ... guilt" in terms of case-law interpretation of the term "direct evidence"). Cases that determine what constitutes a "single occurrence" within the financial limitations of a contract for liability insurance are, therefore, of some relevance.

*Id.* at 250 n. 3.

## I.

■ Under C.J. § 5–303(a), if a local government negligently fails to comply with applicable state and federal regulations pertaining to a particular landfill, and that negligence is the proximate cause of contamination to one or more adjacent properties, each adjacent property owner's claim for money damages would constitute an "individual claim," regardless of how many theories of recovery are asserted.

In Black's Law Dictionary, the term "claim" is defined as follows:

1. The aggregate of operative facts giving rise to a right enforceable by a court. . . . 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional. . . . 3. A demand for money, property, or a legal remedy to which one asserts a right. . . . 4. An interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; CAUSE OF ACTION. . . .

Black's Law Dictionary 281–82 (9th ed.2009).

■ Claim is synonymous with "cause of action," which is defined as

a set of facts sufficient to justify a court in rendering judgment in favor of the plaintiff. *Continental Masonry Co. v. Verdel Constr. Co.*, 279 Md. 476, 369 A.2d 566 (1977); *Kres v. Maryland Auto. Ins. Fund,* 273 Md. 289, 329 A.2d 44 (1974); *Weber v. Unsatisfied Claim & Judgment Fund Bd.,* 261 Md. 457, 276 A.2d 86 (1971); *Hamlin Machine Co. v. Holtite Mfg. Co.,* 197 Md. 148, 78 A.2d 450 (1951). Otherwise stated, a cause of action is a set of facts which would justify judgment for the plaintiff under some recognized legal theory of relief. *Pepper v. Johns Hopkins Hosp.,* 111 Md.App. 49, 680 A.2d 532 (1996), *aff'd,* 346 Md. 679, 697 A.2d 1358 (1997).

Paul Mark Sandler and James K. Archibald, Pleading Causes of Action in Maryland 2 (4th ed.2008).

While the LGTCA is applicable only to Appellee's claims for money damages, all such claims constitute an "individual claim" under C.J. § 5–303(a), even if Appellant was negligent in several different ways.

## II.

■ Under C.J. § 5–303(a), if a local government negligently fails to comply with applicable state and federal regulations pertaining to a particular landfill, and that negligence is the

proximate cause of contamination to one or more adjacent properties, each adjacent owner's claim for money damages would arise out of the "same occurrence," even if the local government was negligent (1) in several different ways, and (2) for an extended period of time.

Because most statutory caps apply to single occurrences, the issue of what constitutes an occurrence can have a significant impact on a plaintiff's recovery when multiple claims or claimants are involved.... [A] single occurrence may be considered to encompass all claims stemming from one proximate cause. Alternatively, a single occurrence may be defined as the event which triggers liability.... [In *Folz v. New Mexico, supra,*] [t]he term "single occurrence" was held to refer to all harm that, although proximately caused by a particular risk arising from the concurrent operation of one or more successive acts of negligence, was triggered by a particular event.

1 *Civil Actions Against State and Local Government: Its Divisions, Agencies, and Officers* § 6.14 at 6–110 (Thomson West, 2d ed.2002).

As to the meaning of "same occurrence" in an excess liability insurance policy, in *CSX Transportation, Inc. v. Continental Insurance Co.,* 343 Md. 216, 680 A.2d 1082 (1996), this Court stated:

By far the vast majority of courts that have considered the issue view it from the perspective of causation, "by referring to the cause or causes of the damage [or injury] and not to the number of injuries or claims." *Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374, 379 (6th Cir.1984).

\* \* \*

The parties are not in disagreement as to the test that controls the resolution of this case. They agree that the applicable test is the "cause" test. Application of that test also seems to be required when the terms of the subject policies are taken into account. Considered from the standpoint of the definition of "occurrence" and the "limits of

liability" in all of the policies, the occurrence "results in" personal injury or property damage or such injury or damage "arises out of" an occurrence. *See Chemstar, Inc., supra,* 797 F.Supp. [1541] at 1546 [ (C.D.Cal.1992), *aff'd,* 41 F.2d 429 (App.D.C.1994) ].

*Id.* at 233–35, 680 A.2d at 1091 (internal citations and footnotes omitted).

While citing *CSX* with approval in his law review article analyzing issues that arise in "Mass Exposure Tort Claims," James M. Fisher states:

When the question is framed in terms of the number of occurrences within a defined policy period because an insurance policy has "per occurrence" limits, the dominant view is to use a proximate cause approach. *See CSX Transp., Inc. v. Continental Ins. Co.* [343 Md. 216], 680 A.2d 1082, 1091 (Md.1996). For example, in *United Services Automobile Ass'n v. Baggett* [209 Cal.App.3d 1387], 258 Cal.Rptr. 52 (Ct.App.1989), the court held that there was a single occurrence when the policyholder negligently struck the decedent's vehicle immediately before a third vehicle struck both vehicles, killing the decedent who was standing next to her vehicle. *Id.* at 58. If liability is based on the policyholder's general policy or practice, the tendency is to treat all claims based on that policy as involving one occurrence. *See, e.g., Chemstar Corp.* [*Inc.*] *v. Liberty Mut. Ins. Co.,* 41 F.3d 429, 433 (9th Cir.1994) (holding that faulty plaster pitting in 28 separate homes constituted a single occurrence under manufacturer's liability insurance policy where essential cause of the losses was the manufacturer's failure to warn which consisted of its failure to mark properly bags in which its product was shipped to ultimate users); *Mead Reinsurance v. Granite State Ins. Co.,* 873 F.2d 1185, 1188 (9th Cir.1988) (holding that when insured's liability must be based on custom or policy, such as municipal liability under 42 U.S.C. 1983, there was necessarily only one occurrence); *Transport Ins. Co. v. Lee Way Motor Freight, Inc.,* 487 F.Supp. 1325, 1326 (N.D.Tex.1980) (holding that there was one occurrence when all discrimination claims were based on policyholder's

pattern and practice of discrimination). A few courts have reached contrary results by emphasizing any temporal disparity between the loss inflicting events. For example, in *American Indemnity Co. v. McQuaig*, 435 So.2d 414 (Fla. Dist.Ct.App.1983), the policyholder fired three shotgun blasts at two deputy sheriffs within a period of less than two minutes. *Id.* at 415. The court viewed the insured's activities to be sufficiently interrupted and discontinuous to amount to two occurrences. *Id.* at 416.

James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claim: The Debate Over the Appropriate Trigger Rule,* 45 Drake L.Rev. 625, 665 n. 151 (1997).

We are persuaded by the authorities cited herein that (1) the "cause" test is applicable to the determination of what does, or does not, constitute the "same occurrence" as that term is used in C.J. § 5–303(a), and (2) continuous and repeated acts of negligence may constitute the "same occurrence." From our review of the facts asserted in Appellee's complaint, we hold that the individual claim cap contained in C.J. § 5–303(a) is applicable to Appellee's multiple claims seeking money damages.

In *Grand River Lime Co. v. Ohio Casualty Insurance Co.,* 32 Ohio App.2d 178, 289 N.E.2d 360 (1972), while rejecting the appellee's argument that it did not have a duty to defend the appellant in a class action lawsuit, "in which the complaint allege[d] property damage and personal injury to members of the class caused by Grand River in its quarrying and manufacturing operations as a result of the emission of air pollutants for a period of some seven years," the Court of Appeals of Ohio stated, "we think it better not to interpret the word 'occurrence' in a sudden or momentary sense, but permit such term to encompass a period of time." *Id.* at 365.

*Grand River* was cited with approval by Hon. Jack B. Weinstein of the United States District Court for the Eastern District of New York in *Uniroyal, Inc. v. The Home Insurance Co.,* 707 F.Supp. 1368 (E.D.N.Y.1988), which involved coverage questions arising out of the "Agent Orange" product

liability litigation that resulted from 110 deliveries of Agent Orange between October 6, 1966 and March 1, 1968. While ruling that those deliveries constituted a "single continuous occurrence," Judge Weinstein stated:

Identifying the deliveries as the single continuous occurrence is well supported by similar resolutions in other cases. In *E.B. Michaels v. Mutual Marine Office, Inc.*, 472 F.Supp. 26 (S.D.N.Y.1979), Judge Weinfeld held that the unloading of a vessel over nine days, in which repeated negligent dropping of the grab-buckets inflicted 200 separate holes on the ship's surfaces, was a "series of continuous and interrelated actions [constituting] an 'event of unfortunate character that takes place without foresight or expectation; a single unfortunate occurrence.'" *Id.* at 30 (paraphrasing New York law and [*Arthur A.*] *Johnson* [*Corp. v. Indemnity Insurance Co.*, 7 N.Y.2d 222, 196 N.Y.S.2d 678, 164 N.E.2d 704 (1959)]). The 200 bucket drops were a single occurrence because

the unloading of the heavy steel scrap obviously could not have been accomplished in a single lifting. The cargo was such that continuous liftings over a period of time, in this instance several days, were required to complete the discharge. Unloading the cargo was a unified and continuous function until completion.

*Michaels*, 472 F.Supp. at 29.

The identical characterization is appropriate to the delivery of Agent Orange. It could not have been accomplished in one batch, because the large quantity purchased necessitated numerous freightcar loads. Continuous shipments over a period of time, in this case months, were required to complete the supply the military needed. Shipment was a uniform, routinized, almost daily function until completion.

Relying in part on Michaels, the court in *Unigard Insurance Co. v. United States Fidelity and Guaranty Co.*, 111 Idaho 891, 728 P.2d 780, 782 (Ct.App.1986), applied the "functional event" test to a snow clearing operation which separately damaged 98 storage shed doors over four hours. The court found the event to be "continuous and repetitive"

and therefore held it was a single occurrence. *Id.* 728 P.2d at 783. *See also Weissblum v. Glens Falls Insurance Co.,* 31 Misc.2d 132, 219 N.Y.S.2d 711 (N.Y. City Ct., Trial Term, Bronx Co.1961) (following *Johnson,* damage to 189 light fixtures during repair of 4500 windows held to be one occurrence).

Finding a single continuous occurrence is especially apt in cases, like [*In re* ] *Agent Orange* [*Product Liability Litigation,* 597 F.Supp. 740 (1984) ], of mass deliveries of hazardous products ultimately imposing damage on large numbers of people. In *Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.,* slip op., No. 85–C–8519 [1987 WL 6611] (N.D.Ill. Feb. 10, 1987), the court applied New York law to multiple separate deliveries of defective plumbing units. It held that the "numerous shipments" on a "mass basis" in which "it was anticipated that any defects in the system would affect a large number of persons in the chain of distribution" were a unitary " 'continuous and repeated exposure' to the same conditions." In *American Universal Insurance Co. v. McCloskey Varnish Co.,* slip op., No. 83–5161 (E.D.Pa. Mar. 19, 1985), the insured had manufactured and sold defective resins over a year-long period to a distributer, who had in turn sold the resins to customers. The court found the practice of supplying the distributor to be a single occurrence, rejecting the view that each shipment or each ultimate injury was a separate occurrence. In *Cargill, Inc. v. Liberty Mutual Insurance Co.,* 488 F.Supp. 49 (D.Minn.1979), aff'd, 621 F.2d 275 (8th Cir.1980) (per curiam), the manufacturer of a nutrient medium for cultivating erythromycin (a pharmaceutical drug) negligently altered the composition of the "Grits 3500" nutrient. The insurer urged that each sale of the defective Grits 3500 was a separate occurrence. The court held that "there was but one occurrence, even though numerous production 'batches' of erythromycin were affected." *Id.* at 53. In *Champion International Corp. v. Continental Casualty Co.,* 546 F.2d 502 (2d Cir.1976), cert. denied, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977), the court found 1400 installations of

defective paneling to constitute one continuous and repeated occurrence. In *Union Carbide Corp. v. The Travelers Indemnity Co.*, 399 F.Supp. 12 (W.D.Pa.1975), the insured manufactured a defective resin-former oil. The court observed that "because this manufacturer was dealing in bulk raw materials it is regularly foreseeable that any defect in the product or negligence in its manufacture would affect a large number of divers persons in the chain of distribution." *Id.* at 17. One insurer urged a single occurrence, while a second insurer urged multiple occurrences. The court found one accident to have occurred, encompassing all sales of the product. *Id.* at 21.

\* \* \*

It is apparent that the herbicide deliveries were so numerous, uniform, routinized and regularized, at such steady and frequent intervals, that they merged into one continuous and repeated event. As one commentator has remarked in a similar context, when "the individual acts that comprise occurrences are repeated with such frequency—indeed, on a daily basis for six years—[then] they appear to lose their distinctiveness and ... merge" into one continuing occurrence. Rodburg & Chesler, *Beyond the Pollution Exclusion: Emerging Parameters of Insurance Coverage for Superfund Liability,* in PLI, Hazardous Waste Litigation 1985 at 347, 374 (1985).

*Id.* at 1383–85.

As was the situation in the Agent Orange litigation, the numerous negligent acts alleged in Appellee's complaint—all of which occurred at the St. Andrews Landfill, where Appellant discontinued its disposal operations nearly seven years before Appellee acquired the property that is the subject of Appellee's claims—were so uniform, routinized and regularized, and occurred at such steady and frequent intervals, that they merged into one continuous "same occurrence" under C.J. § 5–303(a).

**QUESTIONS OF LAW ANSWERED AS HEREIN SET FORTH; EACH PARTY TO PAY 50% OF THE COSTS.**